*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-AA-301

CITIZENS FOR RESPONSIBLE OPTIONS, ET AL.,
PETITIONERS,

v.

DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT,
RESPONDENT,

and

DISTRICT OF COLUMBIA DEPARTMENT OF GENERAL SERVICES,
INTERVENOR.

On Petition for Review of an Order of the
District of Columbia Board of Zoning Adjustment
(BZA App. No. 19452)

(Argued April 23, 2019　　　　　　　　　　　　Decided July 3, 2019)

*David W. Brown* for petitioners.

*Richard S. Love*, Senior Assistant Attorney General, with whom *Karl A. Racine*, Attorney General, *Loren L. AliKhan*, Solicitor General, and *Caroline S. Van Zile*, Deputy Solicitor General, were on the brief, for respondent.

*Meridith Moldenhauer*, with whom *Samantha Mazo* and *Eric J. DeBear* were on the brief, for intervenor.

Before BECKWITH and EASTERLY, *Associate Judges*, and KRAVITZ, *Associate Judge, Superior Court of the District of Columbia.*[*]

KRAVITZ, *Associate Judge*: This court's decision in *Neighbors for Responsive Gov't, LLC v. District of Columbia Bd. of Zoning Adjustment*, 195 A.3d 35 (D.C. 2018), contains a detailed summary of recent efforts by the Mayor and the Council of the District of Columbia to close a large and poorly functioning facility for homeless families known as the DC General Family Shelter and to replace it with a set of smaller shelters to be dispersed throughout the city and designed and operated in accordance with nationally recognized best practices. *Id.* at 40-45. Those efforts have led, among other things, to the enactment of the Interim Eligibility and Minimum Shelter Standards Amendment Act of 2015, D.C. Law 21-75, 63 D.C. Reg. 257 (eff. Feb. 27, 2016), which required the Mayor to maintain an inventory of 280 replacement units for families, in anticipation of the closing of the DC General Family Shelter, *id.* § 2(b)(5), and to the passage of the Homeless Shelter Replacement Act of 2016 (HSRA), D.C. Law 21-141, 63 D.C. Reg. 8453 (eff. July 29, 2016), which authorized the appropriation of $125 million for the planning, design, and construction of six new shelters slated to provide the required replacement units at specifically designated sites in Wards 3, 4, 5, 6, 7, and 8, *id.* §§ 3(a)(2)-(7), (b), (c).

---

[*] Sitting by designation pursuant to D.C. Code § 11-707(a) (2012 Repl.).

The District of Columbia Department of General Services (DGS) has filed applications with the District of Columbia Board of Zoning Adjustment (BZA) requesting zoning relief for shelters proposed at all six of the sites specified in the HSRA. As relevant here, the BZA held a contested hearing on March 1, 2017 on DGS's requests for variances and special exceptions for the shelters planned for Wards 3, 5, and 6. The BZA later issued separate orders granting the relief sought.

Several neighbors and neighborhood organizations filed timely petitions for review in this court of the BZA's orders approving zoning relief for the shelters in Wards 3 and 5. The two petitions have been briefed and argued separately before different divisions of the court, but both cases involve the same roster of attorneys and many of the same assertions of legal error.

The decision in *Neighbors for Responsive Gov't* affirmed the BZA's order granting zoning relief for the Ward 3 shelter. Although the decision did not directly address the petition for review of the BZA's order in the Ward 5 case, it did resolve, in the District's favor, several legal arguments made by the petitioners in both cases. Bound by the resolution of those legal arguments in *Neighbors for Responsive Gov't*, we now conclude that the BZA's order granting the requested

zoning relief for the Ward 5 shelter was consistent with the governing zoning laws and regulations. Concluding further that the BZA's findings of fact underlying its order were supported by substantial evidence in the record, we affirm the BZA's order granting zoning relief for the Ward 5 shelter.

### Factual and Procedural Background

The HSRA designated 1700 Rhode Island Avenue, N.E. as the site for the Ward 5 shelter and authorized the Mayor to construct on the property "a facility to provide temporary shelter for families experiencing homelessness containing up to 50 DC General Family Shelter replacement units." HSRA § 3(a)(4). The law prohibited the use of any of the funds authorized for the project in a manner "inconsistent with [the] act." *Id.* § 3(e).

The property at 1700 Rhode Island Avenue, N.E. is a 12,336-square-foot lot owned by the city and presently improved with a 150-foot-tall communications antenna, a small concrete utility building supporting the antenna's functions, and a vacant three-story building constructed in the 1920s and previously used as a police station. The property is bounded by Rhode Island Avenue to the south and 17th Street to the west. Several single family homes are located directly across

17th Street, and a public alley separates the property from a range of commercial establishments and residential buildings to the east. A four-story apartment building is under construction on the lot immediately to the north of the property, and several larger apartment buildings as tall as 5 ½ stories are within a few blocks. The property is one mile from the Rhode Island Avenue Metro Station and in an area served by multiple bus routes, with a Metrobus stop located at the intersection of 17th Street and Rhode Island Avenue.

The District's plan for the Ward 5 shelter is to repurpose the old police building and to construct a six-story addition along the rear of the property. The ground floor of the expanded structure will be dedicated to the provision of wrap-around services for shelter residents, and floors two through six will have a total of forty-six DC General Family Shelter replacement units, with eleven units each on floors two and three and eight units each on floors four, five, and six. Maximum total capacity will be 150 beds, with a majority of the residents expected to be children. The residential floors are designed to provide direct lines of sight to the units and common areas to enable parents and security officers to observe activity on the floor. The facility will have a brick exterior meant to blend in with the character of the neighborhood and green space for outdoor recreation for residents.

The communications antenna and supporting utility building will be retained on the property but will not be a part of the shelter's functions.

The shelter will be 69.8 feet tall; maintain a rear-yard setback of between 0 and 7.5 feet; have a seventeen-foot-wide open court; and, together with the existing structures, occupy 73% of the lot and cover 44,091 square feet of gross floor area, resulting in a floor-area ratio (FAR) of 3.51.[1]  There will be four off-street parking spaces adjacent to the public alley to the east, three reserved for shelter staff and the fourth for loading and deliveries.  The facility will not have a separate loading dock, but a loading entry will be located next to the parking spaces and be accessible through the public alley.

The property is in a mixed-use zone (MU-4) within Advisory Neighborhood Commission (ANC) 5B, at the border with ANC 5C.  Mixed-use zones generally "provide for mixed-use developments that permit a broad range of commercial, institutional, and multiple dwelling unit residential development at varying

---

[1]  By our calculation, the FAR is 3.57, equal to the gross floor area of the project proposed by the District (44,091 square feet) divided by the area of the lot (12,336 square feet).  *See* 11 DCMR Subtitle B § 303.1 (2016).  Nonetheless, the parties have stated throughout the litigation that the FAR of the District's proposal is 3.51, and the BZA relied on the parties' statements in its decision.  Because the discrepancy is immaterial to our analysis and not a point of contention among the parties, we, too, will employ the 3.51 figure.

densities." 11 DCMR Subtitle G § 100.1 (2016). MU-4 zones, in particular, are intended to "[p]ermit moderate-density mixed-use development"; "[p]rovide facilities for shopping and business needs, housing, and mixed uses for large segments of the District of Columbia outside of the central core"; and "[b]e located in low- and moderate-density residential areas with access to main roadways or rapid transit stops, and include office employment centers, shopping centers, and moderate bulk mixed-use centers." *Id*. § 400.3.

Despite the broadly defined purposes of an MU-4 zone, the property at 1700 Rhode Island Avenue, N.E., like all of the sites designated in the HSRA, requires zoning relief to accommodate the District's plan. Specifically, the site needs special exceptions for emergency shelter use for more than the four people allowed as of right in an MU-4 zone, 11 DCMR Subtitle U §§ 510.1(h), 512.1(a), 513.1(b); for a reduction of the 0.5 parking spaces required for every 1,000 square feet of gross floor area (equal to twenty-two spaces here, given the 44,091 square feet of gross floor area planned for the shelter), *id.* Subtitle C §§ 701.5, 703.1-703.4; for an increase in the 60% lot occupancy permitted as of right, *id.* Subtitle G §§ 404.1, 1200.4; Subtitle X § 901.2; for a decrease in the fifteen-foot rear-yard setback required, *id.* Subtitle G §§ 405.2, 1200.4; Subtitle X § 901.2; and for a decrease in the minimum open-court width of four inches per foot of height (equal to 23.33

feet, given the proposed height of 69.8 feet), *id.* Subtitle G §§ 202.1, 1200.4; Subtitle X § 901.2. The site also requires area variances for an increase in height beyond the fifty feet allowed as of right, *id.* Subtitle G § 403.1; for an increase in the 2.5 maximum allowable FAR, *id.* § 402.1; and for a decrease in the one loading berth and one service-delivery area required, *id.* Subtitle C § 901.1.

DGS accordingly filed an application with the BZA requesting special exceptions for emergency shelter use, parking, open-court width, lot occupancy, and rear-yard setback, as well as area variances for height, FAR, and loading. The BZA automatically made DGS, ANC 5B, and ANC 5C parties to the proceeding, and it granted a request for party status from Citizens for Responsible Options (CFRO), a community organization comprised of neighbors of the designated shelter site.

At the hearing before the BZA on March 1, 2017, DGS presented testimony from senior government officials, Ward 5 residents, and a range of expert witnesses regarding the design of the shelter and its expected impact on the neighborhood surrounding the designated site. The testimony was supported by formal studies of the shelter's likely effect on transportation, traffic, parking, and shade in the neighborhood and by architectural diagrams, photographs, and

renderings. DGS also submitted the Committee Report for the HSRA, as well as memoranda and letters from the District of Columbia Office of Planning, the District of Columbia Public Schools, the District Department of Transportation, and the District of Columbia Fire & Emergency Medical Services Department expressing either affirmative support for or a lack of objection to the requested relief.

DGS's evidence established that to advance the policies underlying the HSRA the DC General Family Shelter must be closed and replaced as soon as possible with smaller, community-based shelters located all across the city. Laura Zeilinger, the Director of the District of Columbia Department of Human Services, testified as an expert in the provision of services to families experiencing homelessness and explained that large facilities like the DC General Family Shelter cannot effectively deliver services in a manner suited to the severe emotional trauma often endured by homeless families. Ms. Zeilinger's testimony echoed the HSRA Committee Report, which stated that the DC General Family Shelter is old and outdated, infested with pests and vermin, and costly and difficult to manage due to its size and faulty systems. D.C. Council, Report of the Committee of the Whole on Bill 21-620, "Homeless Shelter Replacement Act of 2016," at 4 (May 17, 2016).

In contrast, Ms. Zeilinger testified, smaller-scale shelters like the facility proposed for Ward 5 are safe, predictable, and dignified environments for families and offer "the right balance between effective and efficient service delivery" and "quiet, familial setting[s] where families can thrive." The HSRA Committee Report explained further that the provision of small, service-enriched facilities throughout the city will be consistent with best practices for addressing the needs of children and families experiencing homelessness and will lessen the concentration of poverty in just a few wards. Report on Bill 21-620 at 5–6.

DGS's evidence also established that the proposed design of the Ward 5 shelter is necessary to the achievement of the District's programmatic goals. Ms. Zeilinger and Kate Coventry, a senior policy analyst with the D.C. Fiscal Policy Institute, testified that limiting the number of units per floor is essential to a sense of safety and community within the shelter and that the flexible service space on the first floor of the facility will ensure that families and children receive the full range of supportive services they need to advance toward housing security and self-sufficiency. Ryan Moody, the project's lead landscape architect, provided expert testimony that the shelter's landscaping plans are designed to reduce the stress of temporary housing with accessible play and planted areas and to protect

site resources, embrace the historically significant architecture of the existing police building, and engage with the neighborhood through public space gardens. Amber Harding, a Ward 5 resident and a lawyer with the Washington Legal Clinic for the Homeless, added:

> The BZA is often asked to grant variances and exceptions for development where profit is the aim, often at the expense of low-income communities who face displacement. Here, the BZA is being asked to grant relief to help those who have been displaced, to soften the blow of unfettered development by building a safe, humane shelter for families. That is a worthy justification for zoning relief. . . . None of [the concerns raised by opponents of the requested relief] are more important than a need to close D.C. General with a sufficient number of units, the need to have units that provide dignity and privacy to residents, the public interest, and providing an appropriate safety net for children in crisis, or the desire of families to raise their children in the same supportive community that I raise my children in.

DGS's evidence also showed that a smaller building would not satisfy the District government's programmatic needs. Ryan McGhee, the principal architect for the project, testified as an expert that design options for the Ward 5 shelter are constrained by the existing buildings on the property, and Ms. Zeilinger explained that those constraints already led the District to decrease the number of units proposed for the shelter from fifty to forty-six. Ms. Zeilinger testified further that

the shelter could not be made any smaller without preventing the District from meeting its statutory obligation to provide the total of 280 replacement units needed city-wide to close the DC General Family Shelter. Ms. Zeilinger stated that an alternative plan advanced by opponents of DGS's application – the construction of two smaller shelters in Ward 5 that would together provide up to fifty replacement units – would extend the timeline for closing the DC General Family Shelter and effectively double the District's operating costs in Ward 5, since the city would have to locate, develop, and obtain zoning relief for at least one additional site and then provide the same wrap-around services at two shelters in the ward instead of one.

DGS's evidence showed further that the proposed Ward 5 shelter will be compatible with the area's development. Mr. McGhee testified that the six-story building will not be out of the ordinary in the neighborhood, which already has several four- and five-story apartment buildings facing Rhode Island Avenue. Maxine Brown-Roberts, a project manager at the Office of Planning, stated that the facility will fit in well with the development pattern of medium- and low-rise buildings along Rhode Island Avenue.

DGS presented studies conducted by Gorove/Slade and the District Department of Transportation to prove that the proposed shelter will have no materially adverse impact on parking, traffic, or transportation in the area surrounding the designated site. As explained by several expert witnesses, the studies showed that only a small number of shelter residents are likely to own cars and that although 70% of the shelter's staff are expected to drive to work, only about ten staff members will be on the premises at most times, with a maximum of twenty-two to twenty-six staff present during shift changes and other peak periods. The studies showed further that there is ample on-street parking in the vicinity of the site and that even during the hours of highest demand there will be sufficient on-street parking to accommodate both shelter staff and neighborhood residents. Finally, the evidence showed that the District has devised a transportation demand management plan to address any unforeseen traffic-related problems.

The Gorove/Slade study also established that the shelter's loading needs will not interfere with nearby parking or traffic. It is anticipated that there will be only six or seven deliveries each day, most of them outside of rush-hour periods, with food and supply deliveries occurring through the public alley to the east and resident and school pick-ups and drop-offs arranged for a no-parking zone on 17th

Street. A proposed loading management plan will minimize potential timing conflicts and ensure that loading activities have as small a footprint as possible.

Mr. McGhee testified, moreover, that studies conducted by his architecture firm established that shadows caused by the shelter will not be significantly different than those that would be caused by a building of the greatest height allowed as of right in an MU-4 zone, and Mr. Moody testified that the facility will not create significant noise, in part of because of the project's landscaping plans. Ms. Zeilinger added that the shelter will maintain a good-neighbor agreement with residents of the surrounding area and that community advisory teams will notify city officials and help resolve issues arising from any negative impact neighbors may experience.

Finally, testimony from DGS Director Greer Gillis and D.C. Council Chairman Phil Mendelson about the District's site selection process explained why, in their view, no other available site would meet the District's programmatic needs for a family shelter in Ward 5. DGS coordinated with the Department of Human Services to develop relevant criteria for evaluating potential shelter sites throughout the city and then began its search by assessing city-owned properties. In wards in which suitable city-owned properties were not immediately identified,

DGS met with community members and organizations about other possible options, retained a real estate broker to help find appropriate sites, and made a public solicitation for offers of privately-owned properties that could be developed to meet the city's criteria for the shelters.

DGS initially identified 2266 25th Place, N.E. as the Ward 5 site, but the Council rejected that property, located near a trash transfer station, as "unsuitable for use as a family shelter due to environmental concerns." The Council then considered approximately a dozen alternate sites discussed at a hearing on March 17, 2016 and ultimately narrowed the search to two city-owned properties in the ward: 1700 Rhode Island Avenue, N.E. and 326 R Street, N.E. (the Penn Center). Although the Rhode Island Avenue property was initially rejected as too small, the District's concern about the property's size dissipated once a plan to house a pro bono medical center within the Ward 5 shelter was dropped. When it later became known that the Penn Center was already slated for use as swing space during an upcoming modernization of the District's main public library, the Council concluded that the Rhode Island Avenue property was the only suitable site for the Ward 5 shelter.

CFRO did not present any professional studies or expert testimony in response to DGS's evidence, but it did call several Ward 5 residents and nearby property owners as witnesses and submit a letter from the U.S. Commission of Fine Arts (CFA) in opposition to the application. CFRO's witnesses and the CFA expressed concerns about what they characterized as a mismatch between the size of the lot and the size of the proposed shelter, and they warned that the building would be too tall for the surrounding area and would overwhelm nearby structures on and around Rhode Island Avenue. The CFA recommended reducing the number of units in the shelter, a position echoed by many of CFRO's witnesses, who stated that a decrease in the number of units would avoid the need for a variance for height. CFRO's witnesses also expressed concern that the shelter and its residents would cause excessive noise, that the building would block sunlight to nearby residences, and that the three off-street parking spaces would be inadequate and would have a negative impact on the availability of on-street parking in the neighborhood. Finally, CFRO's witnesses asserted that the District failed to conduct an adequate search for a more appropriate site for the family shelter in Ward 5.

ANC 5B submitted a formal resolution opposing all of the requested zoning relief except for DGS's request for a special exception to reduce open-court width.

The ANC principally argued that the District's site selection and design process did not include sufficient resident input, that a shorter building would be more consistent with the zoning plan and nearby development, and that the parking plan would have a negative impact on elderly neighborhood residents, who would no longer be able to find on-street parking near their homes. ANC 5C made no submission to the BZA.

At a public hearing on April 5, 2017, the BZA voted unanimously to grant DGS's application in its entirety. On February 23, 2018, the BZA issued a forty-two-page written order making findings of fact and conclusions of law and explaining in detail its reasons for granting area variances for height, FAR, and loading and special exceptions for emergency shelter use, parking, lot occupancy, rear-yard setback, and open-court width.

The CFRO and several individual Ward 5 residents filed a timely petition for review in this court.

## Standard of Review

Our consideration of a BZA decision granting zoning relief "is subject to the usual limitations on appellate review of agency actions in a contested case." *Neighbors for Responsive Gov't*, 195 A.3d at 47; *see generally* D.C. Code § 2-510 (2012 Repl.). "We will not reverse the BZA's decision unless its findings and conclusions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of its jurisdiction or authority; or unsupported by substantial evidence in the record of the proceedings." *Metropole Condo. Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 141 A.3d 1079, 1082 (D.C. 2016) (internal brackets and quotation marks omitted).

We also will not reweigh the evidence presented below, since "the decision as to what testimony should be credited and given the most weight [is] within the province of the BZA." *Dorchester Assocs. LLC v. District of Columbia Bd. of Zoning Adjustment*, 976 A.2d 200, 216 (D.C. 2009). "As the trier of fact, the Board may credit the evidence upon which it relies to the detriment of conflicting evidence, and need not explain why it favored the evidence on one side over that on the other." *French v. District of Columbia Bd. of Zoning Adjustment*, 658 A.2d 1023, 1035 (D.C. 1995) (internal quotation marks omitted). As long as "there is

substantial evidence to support the Board's finding, then the mere existence of substantial evidence contrary to that finding does not allow this court to substitute its judgment for that of the Board." *Brown v. District of Columbia Bd. of Zoning Adjustment*, 486 A.2d 37, 52 (D.C. 1984) (en banc) (internal quotation marks omitted). "Substantial evidence" is "relevant evidence which a reasonable trier of fact would find adequate to support a conclusion." *Dorchester Assocs.*, 976 A.2d at 212 (internal quotation marks omitted).

## Analysis

### A. Variances

The BZA may grant an application for an area variance if it finds that (1) by reason of an "extraordinary or exceptional" condition affecting a specific piece of property, (2) strict application of the zoning regulations would result in "peculiar and exceptional practical difficulties" for the property's owner, and (3) variance relief from those difficulties can be provided "without substantial detriment to the public good and without substantially impairing the intent, purpose, and integrity of the zone plan as embodied in the zoning regulations and map." D.C. Code § 6-641.07(g)(3) (2018 Supp.); 11 DCMR Subtitle X § 1002.1(a). The party applying

for a variance has the burden of proof, 11 DCMR Subtitle X § 1002.1(a), although, as discussed below, a more flexible standard is applied in some circumstances to requests submitted by non-profit and other public service organizations seeking relief for the purpose of meeting public needs or serving the public interest. Where the more flexible standard applies, the party requesting a variance can establish the existence of an extraordinary or exceptional condition by showing "(1) that the specific design it wants to build constitutes an institutional necessity, not merely the most desired of various options[;] and (2) precisely how the needed design features require the specific variance sought." *Draude v. District of Columbia Bd. of Zoning Adjustment*, 527 A.2d 1242, 1256 (D.C. 1987).

The BZA made specific findings that DGS satisfied all of the conditions for area variances allowing increased building height from 50 to 69.8 feet, increased FAR from 2.5 to 3.51, and loading via the public alley to the east without a loading berth. Concluding that the more flexible public service standard should be applied, the BZA determined that the particular design proposed for the shelter is an institutional necessity given the HSRA's designation of the property as the site for the Ward 5 family shelter and the property's existing improvements. The BZA determined further that strict application of the zoning regulations governing height, FAR, and loading would create practical difficulties for DGS in meeting

the District's programmatic goals and that the requested variances will not substantially impair the area's zoning plan or cause any substantial detriment to the public good.

In reaching its findings, the BZA credited the expert testimony presented by DGS and the conclusions of the Office of Planning that the shelter as proposed will be compatible with the pattern of development along the Rhode Island Avenue corridor and will not harm the neighborhood or its residents. The BZA rejected ANC 5B's argument that a shorter building would be more appropriate for the site, giving greater weight to the extensive evidence presented by DGS that a smaller structure would make it impossible for the District to achieve its programmatic goals. Finally, the BZA concluded that the self-created nature of the practical difficulties faced by DGS in complying with the zoning regulations was not germane to the District's requests for variance relief.

The petitioners challenge the BZA's decision to grant area variances for height and FAR. They begin by advancing three reasons why it was legal error for the BZA to find that the property at 1700 Rhode Island Avenue, N.E. is burdened with an "extraordinary or exceptional" condition: first, that neither the Council's designation of the property in the HSRA as the Ward 5 site nor the presence of

existing structures on the property provided a lawful basis for the BZA's finding; second, that the more flexible public service standard could not properly be applied here, given that DGS was not seeking to expand or continue an existing use on the property; and third, that the BZA wrongly failed to take into account the self-imposed nature of the hardships and practical difficulties claimed by DGS. The petitioners contend further that even if the more flexible public service standard could have been properly applied, the BZA erred in applying it since there was no institutional necessity for height and FAR variances. Finally, the petitioners argue that the BZA granted DGS's requests for variance relief contrary to evidence presented in opposition and without addressing concerns articulated by ANC 5B. The petitioners do not challenge the BZA's decision to grant a variance for loading requirements.

All of the petitioners' arguments relating to the BZA's finding of an extraordinary or exceptional condition on the property are foreclosed by our decision in the Ward 3 case. We held there that the HSRA's designation of the site for the family shelter in Ward 3 was sufficient to create an exceptional condition on the property for the purposes of granting variance relief. *Neighbors for Responsive Gov't*, 195 A.3d at 58–59. We noted that "the Council's designation reflected a legislative determination, supported by substantial evidence, of a

critical public need to utilize the site for the Ward 3 shelter because [the site] is 'uniquely valuable' and 'uniquely suitable' for that purpose," and we held that "[t]he BZA properly considered that determination, not as overriding applicable zoning requirements, but in applying those requirements to the application at hand." *Id.* at 59. If the Council's statutory designation of the Ward 3 site was by itself sufficient to create an exceptional condition on that property, then surely the combination of the Council's statutory designation of 1700 Rhode Island Avenue, N.E. as the site for the Ward 5 shelter and the presence of two existing structures on the property are together sufficient to do the same. *See Gilmartin v. District of Columbia Bd. of Zoning Adjustment*, 579 A.2d 1164, 1168 (D.C. 1990) (determining that an existing structure on a property rightly contributed, as part of "a confluence of factors," to the BZA's finding of an exceptional condition).

We also held in the Ward 3 case that DGS's request for variance relief was properly considered under the more flexible standard for a non-profit or other public service entity seeking to serve an important public need or purpose, even though, as here, relief was not sought for the Ward 3 site solely for the purpose of expanding an already existing use on the property. We stated that "[t]he rationale for such flexibility . . . is that the 'public need for the use is an important factor in granting or denying a variance,'" *Neighbors for Responsive Gov't*, 195 A.3d at 58–

59 (quoting *Monaco v. District of Columbia Bd. of Zoning Adjustment*, 407 A.2d 1091, 1098 (D.C. 1979)), and we concluded that "this rationale is not limited to situations in which the applicant seeks only to expand or continue an existing, previously authorized use," *id.* The two cases are indistinguishable on this point, and we thus conclude that if use of the more flexible standard was proper in the Ward 3 case, then it was proper here, as well.

Finally, concerning the BZA's finding of an extraordinary or exceptional condition, we rejected an argument in the Ward 3 case that the BZA wrongly failed to consider as self-imposed any hardship or practical difficulty the District would encounter through the strict application of the zoning regulations. We recognized that the District's need for variance relief could be fairly characterized as "self-imposed or self-created" given the District's knowledge that the property selected as the site for the Ward 3 shelter would need variance relief, but we held that "prior knowledge or self-imposition of the difficulty did not bar granting an area variance" and "was but one of many factors [the] BZA might consider in reaching its decision." *Neighbors for Responsive Gov't*, 195 A.3d at 60 n.92 (quoting *Gilmartin*, 579 A.2d at 1171). On the merits, we found substantial evidence in the record supporting the BZA's finding that the proposed site was the only feasible option for the shelter needed in Ward 3, and we determined that DGS thus "cannot

be said to have deliberately preferred a site requiring variance relief over an acceptable alternative location that would not have needed such relief." *Id.* at 60. We accordingly concluded that the BZA "had the power to grant area variances to enable construction of the Ward 3 shelter on the Idaho Avenue property and did not abuse its discretion in doing so merely because the District chose the property knowing it would need the variances." *Id.*

We reach the same conclusion here. The BZA may have mischaracterized the law in stating that the self-imposed nature of the practical difficulties facing DGS is not germane. That mischaracterization was harmless, however, given our conclusion in the Ward 3 case and the substantial evidence in the record supporting the BZA's finding that 1700 Rhode Island Avenue, N.E. is the only site that could feasibly be used for the shelter needed in Ward 5. Notwithstanding the petitioners' ardent opposition to that finding, we thus conclude that the BZA acted within its powers in granting area variances to enable construction of the Ward 5 shelter and did not abuse its discretion simply because the District chose the Rhode Island Avenue site knowing the property would need zoning relief.

The petitioners' argument that the BZA misapplied the more flexible standard for public service organizations seeking variance relief in the public

interest fares no better. The petitioners contend that the BZA's finding of an "institutional necessity" for a Ward 5 shelter with forty-six units on six floors was legally flawed because the finding was premised on the erroneous belief that the District needed a total of 280 replacement units to be able to close the DC General Family Shelter when in fact only 270 replacement units were required. According to the petitioners, the District's need for a total of 270 units could have been satisfied with a smaller Ward 5 shelter, making DGS's requests for height and FAR variances less than the institutional necessity the BZA found them to be.

The petitioners' argument must be rejected. The law in effect throughout the time the case was before the BZA required a total of 280 replacement units. In particular, § 2(b) of the Interim Eligibility and Minimum Shelter Standards Amendment Act of 2015 required the District to maintain a minimum of 280 DC General Family Shelter replacement units within its shelter inventory. *See* D.C. Code § 4-753.01(d)(5) (2016 Supp.). That 280-unit statutory requirement remained in effect until February 28, 2018, when another bill, the Homeless Services Reform Amendment Act of 2017, D.C. Law 22-65, § 2(b), 65 D.C. Reg. 331, became effective and reduced the number of required DC General Family Shelter replacement units to 270. *See* D.C. Code § 4-753.01(d)(5) (2018 Supp.); *Neighbors for Responsive Gov't*, 195 A.3d at 40 n.4.

The BZA thus applied the law – requiring a total of 280 DC General Family Shelter replacement units – in effect at all relevant points of its decision-making process: when it held its hearing on March 1, 2017; when it took its public vote on April 5, 2017; and when it issued its final written decision and order on February 23, 2018. It was not until February 28, 2018, five days after the BZA issued its final written decision and order, that the statutory amendment decreasing the total number of DC General Family Shelter replacement units to 270 took effect. Because statutes presumptively operate only prospectively, *Davis v. Moore*, 772 A.2d 204, 228 (D.C. 2001); *Washington v. Guest Servs., Inc.*, 718 A.2d 1071, 1074 (D.C. 1998), the statutory amendment to 270 replacement units has no application to this case. The BZA correctly applied the 280-unit requirement in considering whether DGS established an institutional necessity for a Ward 5 shelter with forty-six units.

This leaves only the petitioners' final argument: that the BZA made the findings underlying its decision to grant area variances for height and FAR contrary to evidence presented in opposition to the requests and without addressing concerns articulated by ANC 5B. This argument has no merit.

It is true, as the petitioners contend, that several neighbors of the proposed shelter testified on behalf of CFRO and expressed worries about the shelter's possible effects on traffic, parking, noise, and sunlight in the neighborhood. The BZA, however, was entitled to give greater weight to the extensive expert testimony presented by DGS and supported by formal studies on transportation, traffic, parking, and shade. We do not reweigh the evidence; rather, our only role in reviewing the BZA's findings is to determine whether they are supported by substantial evidence in the record.

We have no difficulty making that determination. The expert testimony on the programmatic needs of families experiencing homelessness, the architecture and landscaping of the shelter proposed for 1700 Rhode Island Avenue, N.E., the available transportation resources, and the shelter's likely effects on traffic, parking, noise, and shade in the neighborhood, along with the many formal studies, diagrams, photographs, and renderings that underlay the expert testimony, was easily sufficient to enable a reasonable trier of fact to find the evidence adequate to support the BZA's findings. Specifically, the evidence amply supported the BZA's conclusions that (1) there is an institutional necessity to build the shelter according to the specific design proposed by DGS and, thus, an exceptional condition on the property; (2) strict application of the zoning regulations would cause the District

peculiar and exceptional practical difficulties in meeting the statutorily-required programmatic needs for closing the DC General Family Shelter and replacing it with a total of 280 units at smaller shelters throughout the District; and (3) the requested variances for height and FAR can be granted without substantial detriment to the public good and without substantially impairing the intent, purpose, and integrity of the MU-4 zone.

Moreover, the BZA did not fail to give adequate consideration to concerns about the requested variances articulated by ANC 5B. In opposition to the requested variance for height, ANC 5B asserted in its resolution that "a shorter building would be more appropriate given the nearby single-family homes and the site's zoning" and that "permitting an increase in height from 40 feet to 70 feet would substantially impair the intent, purpose and integrity of the zoning plan, because the height is not within the range of a low- to moderate-density zone"; the ANC thus recommended that DGS consider making design revisions to reduce the height to no taller than five floors. Regarding the requested variance for FAR, the ANC's resolution stated only that "[o]n FAR Relief, which influences building footprint and height, ANC 5B opposes the Applicant's request for relief."

By law, the BZA must give "great weight" to "issues and concerns raised in the recommendations" of an affected advisory neighborhood commission and must "articulate with particularity and precision the reasons why the [ANC] does or does not offer persuasive advice under the circumstances." D.C. Code § 1-309.10(d)(3)(A), (B) (2018 Supp.). More specifically, when the BZA decides to pursue a path inconsistent with an ANC's recommendations, it "must acknowledge [the ANC's] concerns and articulate reasons why those concerns and issues were rejected and [why] the relief requested from the zoning regulations was granted." *Metropole Condo. Ass'n*, 141 A.3d at 1087. The BZA is not required to "exhaustively discuss every detail in an ANC's submission," *Spring Valley-Wesley Heights Citizens Ass'n v. District of Columbia Zoning Comm'n*, 88 A.3d 697, 717 (D.C. 2013), or "to defer to the ANC's views," *Levy v. District of Columbia Bd. of Zoning Adjustment*, 570 A.2d 739, 746 (D.C. 1990).

The BZA fully satisfied its obligations. It disagreed with the ANC's objections and recommendations regarding the requested variance for height, first pointing out that the ANC misstated the building height (fifty feet, not forty) and development density (moderate mixed-use, not low to moderate) allowed as of right in an MU-4 zone, and then relying on the extensive expert testimony in the record to conclude that the six-story design for forty-six units proposed by DGS is

essential to the programmatic needs of families experiencing homelessness in the District. Regarding the requested variance for FAR, the BZA acknowledged the ANC's opposition but accurately noted that the ANC "did not state any specific issues or concerns" the BZA could address.

## B. Special Exceptions

The BZA has authority to grant a request for a special exception to a zoning requirement if it determines that the exception will (1) be in harmony with the general purpose and intent of the zoning regulations and maps, (2) not tend to have an adverse effect on the use of neighboring property in accordance with the zoning regulations and maps, and (3) meet all of the conditions specified in the zoning regulations. 11 DCMR Subtitle X § 901.2; *see id.* Subtitle G § 1200.4. The applicant for a special exception has the burden of proving its entitlement to the relief requested. *See id.* Subtitle X § 901.3. The BZA, however, must grant the request if it finds that all of the express conditions for the exception set forth in the zoning regulations have been met. *Neighbors for Responsive Gov't*, 195 A.3d at 53 (citing *Stewart v. District of Columbia Bd. of Zoning Adjustment*, 305 A.2d 516, 518 (D.C. 1973)).

*Emergency Shelter Use*

Property in an MU-4 zone can be used as of right for an emergency shelter serving up to four people, 11 DCMR Subtitle U §§ 510.1(h), 512.1(a), but a special exception must be obtained before the property can be used for a shelter serving a larger clientele. For an emergency shelter housing between five and twenty-five people, an applicant seeking a special exception must show, in addition to the general requirements for special exception relief, that (1) there is no other property containing an emergency shelter for seven or more persons in the same square or within a radius of 500 feet from any portion of the property; (2) the shelter will have adequate, appropriately located, and screened off-street parking to provide for the needs of occupants, employees, and visitors to the facility; (3) the shelter will meet all applicable code and licensing requirements; (4) the shelter will not have an adverse impact on the neighborhood because of traffic, noise, operations, or the number of similar facilities in the area; and (5) if there is another emergency shelter in the same square or within 500 feet of the facility, then together the shelters will not have an adverse impact on the neighborhood because of traffic, noise, or operations. *Id.* Subtitle U § 513.1(b)(1)-(5). To secure approval for an emergency shelter serving more than twenty-five people, the applicant also must demonstrate that (6) the program goals and objectives of the District of Columbia

cannot be achieved by a facility of a smaller size at the location and there is no other reasonable alternative to meet the program needs of that area of the District. *Id.* Subtitle U § 513.1(b)(6).

The BZA found that DGS satisfied all of the requirements for a special exception for an emergency shelter serving more than twenty-five people. In particular, the BZA found that the proposed facility will be the only emergency shelter in the vicinity, that the three off-street parking spaces provided in the plan are appropriately located and adequate to meet the shelter's low parking demand, that the shelter will have little effect on traffic and no adverse impact on the neighborhood, and that procedures will be in place to prevent any adverse effects relating to noise or operation of the shelter. The BZA found further that the shelter's programmatic goals cannot be achieved by a smaller facility, that there are no reasonable alternatives to the Rhode Island Avenue site, and that the emergency shelter use is in harmony with the purpose and intent of the zoning regulations, zoning maps, and MU-4 zone and is not incompatible with the residential uses of neighboring properties.

The BZA rejected CFRO's argument that an emergency shelter for up to 150 people "stretches the contemplated scope of the special exception," explaining that

11 DCMR Subtitle U § 513.1(b) plainly allows for special exception approval of shelters for more than twenty-five people and that in promulgating the regulation the Zoning Commission chose not to limit the number of residents who could be served in such a facility. The BZA also rejected arguments by ANC 5B about the height and size of the proposed facility, stating that the proposed design for the shelter is essential to its programmatic goals and is compatible with the existing development in the area. Finally, the BZA disagreed with CFRO's argument that DGS needed additional proof of a "meaningful" or "diligent" search for a reasonable alternative site, pointing to evidence of the District's extensive site selection process.

The petitioners contend that DGS failed to prove either the absence of a reasonable alternative site in Ward 5 or the adequacy of the off-street parking to be provided for the occupants, employees, and visitors of the proposed shelter. The petitioners contend further that the BZA improperly granted an "exception within an exception" by approving both a special exception for an emergency shelter for more than twenty-five people – which required proof of adequate off-street parking – and a separate special exception for parking. None of these arguments has merit.

Central to the petitioners' claim that the District failed to prove the absence of a reasonable alternative site in Ward 5 is the assertion that the District did not conduct an adequate search for a more appropriate property in the ward to meet its programmatic needs. However, substantial evidence presented to the BZA established that the District considered other city-owned properties in Ward 5, retained a real estate broker and announced a public solicitation for offers to learn of private properties available for lease, met with community members and organizations about other possible options, and rejected alternative sites in the ward because of concerns about their cost, safety, and programmatic suitability. We found a virtually identical set of steps "a reasonable and systematic effort to locate a suitable alternative site for the Ward 3 shelter," *Neighbors for Responsive Gov't*, 195 A.3d at 54 (internal quotation marks omitted), and we reach the same conclusion here with regard to Ward 5.

Substantial evidence in the record also supports the BZA's finding that the proposed shelter will have adequate, appropriately located, and screened off-street parking to provide for the needs of all occupants, employees, and visitors to the facility. The BZA considered the petitioners' concerns about the shelter's possible effect on the availability of on-street parking in the neighborhood, but it credited the expert testimony and related parking, transportation, and other studies

presented by DGS in finding that three off-street parking spaces will be sufficient to avoid any materially adverse effect on the availability of on-street parking for residents of the neighborhood. As the trier of fact, the BZA acted within its powers in crediting the District's evidence over the concerns expressed by CFRO, and it is not our role to reweigh the evidence or to substitute our own judgment for that of the BZA.

Finally, the petitioners' "exception within an exception" argument finds no support in the zoning regulations. As we have discussed, a special exception for an emergency shelter in an MU-4 zone requires "adequate, appropriately located, and screened off-street parking," 11 DCMR Subtitle U § 513.1(b)(2), but no particular number of spaces. The fact that the BZA also granted a special exception for the number of off-street parking spaces is thus an independent matter, to be reviewed separately and on its own merits.

### *Parking, Open-Court Width, Lot Occupancy, and Rear-Yard Setback*

The petitioners do not argue that the BZA's findings underlying its decision to grant special exceptions for parking, open-court width, lot occupancy, and rear-yard setback lack the support of substantial evidence in the record. Instead, the

petitioners contend that these four additional special exceptions were unjustified byproducts of the improperly granted relief for height, FAR, and emergency shelter use and that the BZA granted the additional special exceptions without even mentioning concerns raised by ANC 5B about three of the four.

These arguments must be rejected. First, we have already determined that the variances for height and FAR and the special exception for emergency shelter use were granted in accordance with the governing zoning laws and regulations and were supported by substantial evidence in the record. The special exceptions for parking, open-court width, lot occupancy, and rear-yard setback therefore were not unjustified byproducts of other improperly granted zoning relief. Second, the BZA's written order directly addressed ANC 5B's stated concerns about the District's requests for special exceptions for parking, lot occupancy, and rear-yard setback. Contrary to the petitioners' assertion, the BZA expressly acknowledged the ANC's concerns and clearly explained, at pages 30 (parking), 31 (lot occupancy), and 32 (rear-yard setback), why, in light of the expert testimony and other evidence presented by DGS, it found the ANC's concerns unpersuasive. The BZA most assuredly gave the ANC's views the "great weight" to which they were entitled by statute and our case law.

### C. Consistency with the Comprehensive Plan and the Purpose and Intent of the MU-4 Zone

Finally, the petitioners argue that the BZA's decision must be overturned because the zoning relief granted for the Ward 5 shelter is inconsistent with the Comprehensive Plan and the purpose and intent of the MU-4 zone. We do not agree.

The District of Columbia Zoning Commission has exclusive responsibility for ensuring that the zoning regulations are drafted in a manner not inconsistent with the Comprehensive Plan. *French*, 658 A.2d at 1034. The BZA, by contrast, has only the "limited function" of "assur[ing] that the regulations adopted by the Zoning Commission are followed; [the BZA] has no authority to implement the Comprehensive Plan." *Id.* (internal quotation marks omitted). In reviewing a BZA decision to grant an application for zoning relief, therefore, it is not our proper role to consider whether the relief granted is consistent or inconsistent with the Comprehensive Plan; our only task is to decide "whether the Board," supported by substantial evidence, "correctly followed the regulations – not the Comprehensive Plan – in granting [the] application." *Id.*

We have already determined that the BZA correctly followed the zoning regulations promulgated by the Zoning Commission in granting the requested variances and special exceptions for the Ward 5 shelter. Because substantial evidence in the record supports the BZA's findings of fact, including the determination that the requested relief can be granted without substantially impairing the intent, purpose, and integrity of the MU-4 zone, *see* D.C. Code § 6-641.07(g)(3); 11 DCMR Subtitle X § 1002.1(a), we may not disturb the BZA's decision on the basis of any alleged inconsistency with the Comprehensive Plan or the purpose and intent of the MU-4 zone.

## Conclusion

For the foregoing reasons, the order of the District of Columbia Board of Zoning Adjustment is affirmed.

*So ordered.*