**NEIGHBORS ON UPTON STREET,
et al., Petitioners,**

v.

**DISTRICT OF COLUMBIA BOARD
OF ZONING ADJUSTMENT,
Respondent.**

Selma M. Levine School of
Music, Intervenor

No. 95–AA–1630.

District of Columbia Court of Appeals.

Argued March 6, 1997

Decided June 12, 1997.

---

Nicholas G. Karambelas, Washington, DC, for petitioner.

H. Jonathan Redway, with whom John W. Nields, Washington, DC, was on the brief, for intervenor.

Charles F.C. Ruff, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, filed a statement in lieu of brief, for respondent.

Before TERRY and KING, Associate Judges, and GALLAGHER, Senior Judge.

TERRY, Associate Judge:

The owner of a building filed an application for a special exception under the zoning regulations to permit the Levine School of Music to use the existing building and a proposed new addition as a private music school. Advisory Neighborhood Commission (ANC) 3F opposed the application, arguing that the presence of the Levine School would result in increased traffic and parking problems in the neighborhood, which is classified as a low density residential district (R–1–A) under the District of Columbia zoning regulations. Other neighborhood groups, including Neighbors on Upton Street, the Van Ness East Condominium Association, and the Van Ness South Tenants Association, also opposed the application. These three organizations, the petitioners in this case, contended that the Levine School was not eligible for a special exception because it was not a "private school" within the meaning of the applicable regulation, 11 DCMR § 206 (1995).

The Board of Zoning Adjustment (BZA) held hearings on the application in January and February 1995. At the conclusion of those hearings, the BZA asked the Levine School to submit a revised traffic management plan incorporating various suggestions made at the hearings. The school filed the revised plan on March 15. On April 5 the BZA voted unanimously (with one member recused) to grant the requested special ex-

ception, subject to several conditions and restrictions, including limits on the number of persons allowed at the school at any given time and on the school's hours of operation. On November 1, 1995, the BZA issued a twenty-six-page final order stating, *inter alia,* that because the Levine School was a private school within the meaning of section 206, it was eligible for a special exception. The BZA also found that the ANC's concerns about traffic and parking were not supported by the evidence.

Petitioners seek reversal of the BZA's ruling that the Levine School is a private school. They claim it is a trade school, a use prohibited under the zoning regulations. Petitioners also maintain that the BZA effectively amended the regulations by granting a special exception for an addition to a non-conforming structure when the addition itself was a nonconforming use. They further argue that the BZA failed to give "great weight" to the ANC's concerns, as required by law, because the ANC was not given an adequate opportunity to comment on the revised traffic plan. We hold that all of these claims are without merit and accordingly affirm the decision of the BZA.

I

The Levine School is a non-profit private music school that has been in existence for about twenty years. It is now located in leased space, a former convent near Georgetown University Hospital, operating as a private school under a special exception previously granted by the BZA. The school offers individual and classroom music instruction in orchestral instruments, piano, and voice, for students of all ages and abilities. It also has an extensive educational outreach program. It sponsors recitals in conjunction with public and private schools in the District of Columbia, and its students and faculty present concerts in local hospitals and other community facilities. The Levine School is one of only seventeen schools in the nation accredited as "community music schools" by the National Association of Schools of Music. It is rapidly outgrowing its present building and is in need of a bigger one.

The proposed site for the school's new location is a single lot in Northwest Washington near Rock Creek Park, containing almost four and a half acres. The Geophysical Laboratory of the Carnegie Institution of Washington was built on that lot in 1906 and occupied it until 1989, when the laboratory was closed. The site has been vacant since then. Currently, there are three buildings on the lot: a main building, a boiler room, and a former x-ray laboratory. The site is bounded by the Howard University Law School on the west, the Embassy of the Netherlands on the north, and Upton Street, N.W., on the east and south.

The Levine School's plan for the site envisions a total student enrollment of 1500, with a faculty of 98 professionally trained musicians who will teach at the school on a part-time basis. Instruction will usually be given individually, although there will also be some classes for larger groups.[1] The school intends to renovate the existing main building and boiler room and convert them into classroom and teaching facilities, with a recital hall in the present boiler room as well as administrative support space. The plan also includes restoring the former x-ray laboratory for use as living quarters, either by a resident caretaker or by an artist-in-residence, or possibly as a parent/student lounge. A proposed addition to the main building will house teaching studios, some classrooms, rehearsal facilities, offices, and a 300-seat performance auditorium.[2] Finally, the school proposes to build a 114-space parking lot. The school recently purchased the property from the Carnegie Institution, and renovation work on the main building has begun.[3]

1. Given the nature of the classes and the staggered scheduling, the maximum number of people expected to be on the premises at any one time during normal school hours will be no more than 150.

2. The proposed addition conforms to the height, lot occupancy, and other restrictions of an R–1–A zoning district. It is set back approximately 200 feet from the nearest curb on Upton Street.

3. Over the course of several meetings with members of the community, the Levine School made concessions in its plans for the site. It reduced the size of the new auditorium from 450 to 300 seats and agreed to provide on-site parking for

At the hearings before the BZA, the Levine School presented a traffic consultant, an architect, and a landscape architect, all of whom said that the school would have a minimal impact on the surrounding neighborhood. All three experts testified about the extensive steps the school would take to ensure that it would not alter the character of the community.

The ANC nevertheless continued to oppose the granting of a special exception for the Levine School, focusing particular attention on the likelihood of increased traffic on Upton Street and the surrounding streets. The ANC asserted that off-street parking would be inadequate and inconvenient during performances in the new auditorium and that the shortage of off-street parking would affect the availability of on-street parking in the area. Some community groups, including the three petitioners, also opposed the application for the same reasons and urged continued negotiations to decrease the negative impact of the Levine School on the neighborhood. They offered testimony from their own traffic consultant, who said that the presence of the school would cause an unacceptable increase in traffic. Other groups from the community, however, as well as individual residents, supported the application.

In its final order, the BZA found that the proposed use for the site fits the definition of a private school as that term is used in section 206 of the zoning regulations. Although there will be some increase in automobile traffic, vehicular access to the school will be "located so as to improve safety and minimize intrusion into the residential neighborhood ... so that the project will create no dangerous or otherwise objectionable traffic conditions." The BZA found that the school's landscaping plan would provide "an adequate buffer" for nearby properties and that the 114–space parking lot would be "am-

ple ... for the daily operation of the school." The ANC's concerns about traffic and parking, the BZA said, "are unsupported by the evidence"; any possible adverse effect on traffic would be "mitigated by the conditions of this Order."[4] The BZA said that the Levine School's architect and landscape architect presented "credible and irrefutable evidence that the project will not have a negative impact from an architectural or urban planning perspective." After noting that the site "has been used for institutional purposes for almost ninety years," the BZA granted the request for a special exception.

## II

Our standard of review is well established. "This court's review of the decision of the Board of Zoning Adjustment is limited to a determination of whether the decision is arbitrary, capricious, or otherwise not in accordance with the law." *Davidson v. District of Columbia Board of Zoning Adjustment,* 617 A.2d 977, 981 (D.C.1992) (citation and footnote omitted). "The Board's interpretation of the [zoning] regulations must be accorded great weight, and must be upheld unless it is plainly erroneous or inconsistent with the regulations." *Glenbrook Road Ass'n v. District of Columbia Board of Zoning Adjustment,* 605 A.2d 22, 30 (D.C.1992) (citation omitted); *accord, e.g., Downtown Cluster of Congregations v. District of Columbia Board of Zoning Adjustment,* 675 A.2d 484, 491 (D.C.1996). With these principles in mind, we consider petitioners' claims of error.

### A. *Private school or trade school?*

The site at issue is located in an R–1–A zoning district. Chapter 2 of Title 11 of the District of Columbia Municipal Regulations lists permissible uses in an R–1 district.[5] Section 206, which authorizes private schools, provides:

---

all of the school's activities. It also accepted a limitation on the number of performances that will be given in the new auditorium. Finally, the school agreed not to rent its facilities to the general public.

**4.** In granting the application, the BZA imposed twenty conditions affecting the number of students, operating hours, and number and frequen-

cy of performances in the auditorium and recital hall.

**5.** R–1 zoning districts are subdivided into two categories, R–1–A (for low density one-family detached dwellings) and R–1–B (for high density one-family detached dwellings). 11 DCMR § 105.1(a)(1).

206.1. Use as a private school, but not including a trade school, and residences for teachers and staff of a private school, shall be permitted in an R–1 district if approved by the Board of Zoning Adjustment in accordance with the conditions specified in § 3108 of chapter 31 of this title,[6] subject to the provisions of this section.

206.2. The private school shall be located so that it is not likely to become objectionable to adjoining and nearby property because of noise, traffic, number of students, or otherwise objectionable conditions.

206.3. Ample parking space, but not less than that required in chapter 21 of this title, shall be provided to accommodate the students, teachers, and visitors likely to come to the site by automobile.

Neither "private school" nor "trade school" is defined in the zoning regulations. Words that are not defined in the regulations, however, "shall have the meanings given in *Webster's Unabridged Dictionary*." 11 DCMR § 199.2(g); *see Concerned Citizens of Brentwood v. District of Columbia Board of Zoning Adjustment*, 634 A.2d 1234, 1242 n. 18 (D.C.1993). We therefore turn to the dictionary to determine whether the Levine School is a private school or a trade school.

The dictionary defines "school" in relevant part as follows:

*a:* an organized source of education or training: as (1): an institution for the teaching of children: an elementary or secondary school (2): an institution for specialized higher education usu[ally] within a university ... (3):[a] college [or] university ... (4): an establishment for teaching a particular skill or group of skills [such as] a [school] of design, a fencing [school], a beauticians' [school]; *b:* a place where instruction is given....

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2031 (1976). A "private school" is defined as "a school that is established, conducted, and primarily supported by a nongovernmental agency." *Id.* at 1805. "Trade school" is defined as "a school usu[ally] on the secondary level devoted esp[ecially] to teaching the practice and theory of skilled trades." *Id.* at 2422. "Trade" is defined in relevant part as follows:

the business one practices or the work in which one engages regularly: one's calling: gainful employment: means of livelihood: occupation [for example] wherever a ... writer or any sort of artist is plying his [trade] ... as (1): an occupation requiring manual or mechanical skill and training: a craft in which only skilled workers are employed....

*Id.* at 2421.

■ Petitioners contend, first of all, that the Levine School is not a "school" within the dictionary definition of the term. They argue that the Levine School does not meet any of the first three definitions because it is not an elementary or secondary school, an institution for higher education, or a college or university. Nor, they say, does it fit the fourth definition, "an establishment for teaching a particular skill," since it resembles an arts center or business more than a school. They cite the Levine School's description of itself as a "center for the community" offering Washington's musicians and arts organizations "a place to work and exchange ideas with colleagues, students, and audiences."

■ It is true, as petitioners tell us, that some courts in other jurisdictions have declined to consider education as including instruction in the arts.[7] In deciding this case,

6. 11 DCMR § 3108 permits the BZA to grant special exceptions, subject to certain conditions set forth elsewhere in the regulations. *See also* D.C.Code § 5–424(g)(2) (1994) (authorizing BZA to grant special exceptions in accordance with zoning regulations).

7. In *Medinets v. Hansen*, 31 N.J.Super. 102, 106 A.2d 39 (Law Div.), *appeal dismissed on other grounds*, 33 N.J.Super. 237, 109 A.2d 675 (App. Div.1954), the court held that "the maintenance

of a school for the sole purpose of teaching voice, dancing, and instructions in the playing of musical instruments is a business and not a private school, in accordance with the provisions of the zoning ordinance." *Id.* at 103, 106 A.2d at 40. The court explicitly adopted the view that a permitted "school" included only those with a curriculum equivalent to that in the public schools. *See also Kurz v. Board of Appeals of North Reading*, 341 Mass. 110, 113, 167 N.E.2d 627, 629 (1960) ("the teaching of the various types of

however, we must look not to those cases but to the dictionary definition, since that is what the District of Columbia zoning regulations *expressly require.* The Levine School plainly meets the dictionary definition of a "school," namely, "an organized source of education or training," as well as "a place where instruction is given." It also fits within the fourth definitional example because, as the record abundantly shows, it is "an establishment for teaching a particular skill or group of skills."[8] It is "private" in that it is "established, conducted, and primarily supported by a nongovernmental agency," namely, its Board of Trustees.

Petitioners also argue that the Levine School is a trade school and thus barred by 11 DCMR § 206. They point out that music can be a "business" or "calling" as well as a "livelihood" or "occupation." The dictionary even uses the example of "any sort of artist ... plying his [trade]" in defining the term. Petitioners claim that since the Levine School trains future concert professionals, for whom music is a livelihood, it meets the dictionary definition of a trade school. We disagree. Although some music school graduates become professional musicians, music schools generally do not exist just to teach students a trade. "In fact, the teaching of music has been described as an educational use entitled to locate wherever educational uses are permitted." 2 KENNETH H. YOUNG, ANDERSON'S AMERICAN LAW OF ZONING 675 (1996); *see People v. Kelly,* 255 N.Y. 396, 400, 175 N.E. 108, 109 (1931) (" 'Trade' ... has the meaning of mechanical employment or commercial or business enterprises ... [or] some business or money making occupation as distinguished from the professions, the arts, or agriculture"). A music school, some of whose alumni become professional musicians, is no more a trade school than any high school, for example, whose graduates include carpenters and automobile mechanics applying skills that they learned in shop class.

dances ... with the possible exception of the classical ballet, can hardly be considered educational use in the ordinary sense"); *Yanow v. Seven Oaks Park,* 11 N.J. 341, 358, 94 A.2d 482, 491 (1953) (schools for the teaching of special arts may be reasonably excluded from a residential district because they are for business uses).

In any event, we are not bound by the school's description of itself as a "center for the community." Far more significant is what the record actually shows about what goes on at the Levine School on a daily basis. Its classes are designed for all ages and all levels of skill. The Early Childhood Music classes teach rhythm, singing, and movement through play for children between the ages of eighteen months and eight years. The Preparatory Division, which serves more than 650 students between the ages of seven and eighteen, offers comprehensive training to develop enhanced music skills, understanding, and appreciation. The Adult Division, which serves approximately 300 students, meets the full spectrum of adult musical interests from the novice to the accomplished player. Although a small percentage of its students may go on to further training, and an even smaller percentage to performing careers, the great majority do not. Thus it is apparent that the Levine School, in its daily operations, provides music education in a broad sense rather than training for a business or profession. We hold, accordingly, that the Levine School is not a trade school and is thus eligible to be granted a special exception.

### B. *The new auditorium*

Petitioners claim that the Levine School's planned addition does not conform to the use and structure requirements of 11 DCMR § 2001.3(b), which provides:

Enlargements or additions may be made to [nonconforming structures devoted to conforming uses]; Provided, that the following requirements shall be met:

(a) The structure shall conform to percentage of lot occupancy requirements; and

(b) The addition or enlargement itself shall conform to use and structure requirements; and

8. We therefore need not consider whether it also fits any of the first three examples in the dictionary.

(c) The addition or enlargement itself shall not increase or extend any existing, nonconforming aspect of the structure, and shall not create any new nonconformity of structure and addition combined.

The existing structure on the premises (the former Geophysical Laboratory) is a non-conforming structure devoted to a conforming use. The addition that the Levine School proposes to build would include a 300–seat performance auditorium, additional teaching studios, classrooms, rehearsal facilities, and offices. Petitioners claim that, under 11 DCMR § 2001.3(b), the proposed auditorium does not conform to the use requirements of an R–1–A district. They argue that a 300–seat auditorium does not contribute to the educational mission of the Levine School, and that the school therefore should have been required to apply for a use variance under 11 DCMR § 3107 in order to construct the proposed addition. Petitioners contend that, by granting permission to construct the addition under a special exception, the BZA in effect impermissibly amended the zoning regulations.

The issue that we must decide is whether the 300–seat auditorium is a conforming use for a private music school. The record demonstrates that it is a conforming use. The Executive Director of the Levine School testified that the auditorium is an essential part of the school's educational mission. There is, he said, a natural progression for music students that requires them to start in small performance spaces and move up to larger spaces, and for that purpose a performance auditorium is essential.[9] In addition, the National Association of Schools of Music requires its members to provide performance training spaces and performing auditoriums for music education.

This testimony makes clear that the proposed addition to the existing building, including the auditorium, contributes to the educational mission of the Levine School. It is therefore an addition to a non-conforming structure devoted to a conforming use. Since it meets all other relevant zoning requirements (see note 2, *supra*), we hold that it complies with 11 DCMR § 2001.3.

### C. *The ANC and the revised traffic plan*

■ The BZA is obligated to give "great weight" to the views of the ANC. *See* D.C.Code § 1–261(d) (1992); 11 DCMR § 3307.2. As this court held almost twenty years ago, in construing the predecessor of section 1–261(d):

[A]n agency must elaborate, with precision, its response to the ANC issues and concerns. . . . [T]he agency must articulate why the particular ANC itself, given its vantage point, does—or does not—offer persuasive advice under the circumstances. . . .

. . . [W]e believe that "great weight" implies explicit reference to each ANC issue and concern *as such*, as well as specific findings and conclusions with respect to each.

*Kopff v. District of Columbia Alcoholic Beverage Control Board*, 381 A.2d 1372, 1384 (D.C.1977) (emphasis in original).

At the hearing on February 22, 1995, the BZA asked the Levine School to submit by March 15 a revised transportation management plan addressing some of the concerns that had been expressed by the BZA. Other parties, including the ANC, were allowed until March 29 to respond, and all proposed findings were to be submitted by March 29 as well. The BZA would then "consider a decision" by April 5. The record reflects that the BZA voted on April 5 to grant the appli-

---

9. Discussing the use of the proposed auditorium, the Executive Director testified:

We start with the very first building block of a score that is given to a child for the first time, and they go one page at a time and learn that score with their teacher and with their friends. They build the costumes one stitch at a time. They build the set, if we have one . . . in a very modest setting. But all of that is part of the educational learning experience, and it takes in most instances between six and sixteen weeks for a student to go through this educational journey. . . .

[A 300–seat auditorium] would be the kind of space that would serve both the educational musical needs and the family support needs of the children. It would also be a space that would still look like a real theater, and it would, for a young person, give them a sense that they had made it. . . .

cation for a special exception, subject to twenty conditions that were later set forth in the final order.

■ The Levine School's revised plan was filed with the BZA on March 15. Appended to the cover letter was a certificate of service, stating that a copy of the plan had been hand-delivered to several named persons and to "ANC 3F." Petitioners contend that this certificate was defective on its face because it alleges service on "ANC 3F" but not on a "person" as required by 11 DCMR § 3305.4.[10] For reasons not disclosed by the record, the ANC did not submit a response to the revised plan. Petitioners assert (without any record support) that the reason for the ANC's failure to respond was that it was never served with it. They argue that the BZA cannot be deemed to have given the required "great weight" to the concerns of the ANC, even though the BZA expressly said it did, because the ANC never had an opportunity to submit its views on the revised traffic plan.

In a footnote in its brief, the Levine School states:

> Apparently, the ANC moved its office shortly before the filing of the supplemental traffic plan. As a result, the supplemental traffic plan was initially served on the ANC's former address.... Thereafter, it was returned to counsel, who, after ascertaining the ANC's new address, served it on the new address.

Petitioners do not challenge this representation,[11] making only the technical argument

that because the ANC is not a "person," any purported service on it is void. The certificate of service, they contend, shows on its face that the ANC was not validly served because service was not made on a person. This argument overlooks another regulation, 11 DCMR § 3399.1, which provides that "[w]hen used in this chapter"—*i.e.*, for purposes of service under section 3305.4—the word "person" is defined as "an individual, partnership, association, corporation, public agency, governmental unit or department, or other legal entity." 11 DCMR 3399.1. Since the ANC is a public agency, we hold that it was properly served with the revised traffic plan.

■ Finally, petitioners contend that the BZA was required by D.C.Code § 1–261(b) to give the ANC at least thirty days within which to respond to the revised traffic plan, and that the BZA erred in failing to do so. Since the Levine School did not submit its revised plan until March 15, petitioners assert that the BZA granted the special exception (on April 5) before the thirty days had expired. We hold that section 1–261(b) is not applicable here. This section of the Code requires the District of Columbia government, or any of its agencies, to give thirty days' notice to any affected ANC of any proposed action in a rulemaking proceeding.[12] It cannot reasonably be read as imposing a requirement on the BZA to allow an ANC (or anyone else) thirty days to respond to a supplemental submission in a zoning appeal. By its terms, the statute simply

---

10. 11 DCMR § 3305.4 provides:
Proof of service, stating the name and address of the person on whom served and the manner and date of service, shall be shown, and may be made by either of the following methods:
(a) Written acknowledgment of the party served or his or her representative; or
(b) The written statement of the person making the service.

11. The ANC itself has never asserted that it was not served. Under the circumstances, we think it reasonable to expect that if in fact it was never served, the ANC would have complained to the BZA long before the BZA entered its final order.

12. D.C.Code § 1–261 provides in pertinent part:
(a) Each Advisory Neighborhood Commission ... may advise ... all independent agencies,

boards and commissions of the government of the District of Columbia with respect to all proposed matters of District government policy including decisions regarding planning [and] streets ... which affect that Commission area. For the purposes of this [section], proposed actions [*sic*] of District government policy *shall be the same as those for which prior notice of proposed rulemaking is required* pursuant to [another statute] or as pertains to the Council of the District of Columbia.
(b) Thirty days written notice of such District government actions or proposed actions shall be given by mail to each Commission affected by said actions [with certain exceptions not applicable to this case].
[Emphasis added.]

does not address the situation presented here.

What governs this case is not section 1–261(b) of the Code but 11 DCMR § 3326.6, which states:

Written responses shall be filed within seven (7) days following the date by which the exhibits, information, or briefs were due, unless otherwise directed by the presiding officer.

Since the BZA gave the parties fourteen days, not just seven, within which to file responses to the revised traffic plan, petitioners' claim of inadequate notice is without merit.

### III

For the foregoing reasons, the final order of the BZA is

*Affirmed.*