*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-AA-0294

GARY YOUNGBLOOD, ET AL., PETITIONERS,

V.

DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, RESPONDENT,

AND

MIC9 OWNER, LLC, INTERVENOR.

On petition for review of an order from the District of Columbia Board of Zoning Adjustment
(Order No. 19689)

(Argued September 17, 2020                    Decided October 28, 2021)

*Heather M. Benno* for Petitioners.

*Karl A. Racine*, Attorney General, *Loren L. AliKhan*, Solicitor General, and *Carl J. Schifferle*, Acting Deputy Solicitor General, filed a statement in lieu of a brief for the respondent District of Columbia Board of Zoning Adjustment.

*Deborah B. Baum* and *David J. Stute*, for Intervenor, M1C9 Owner, LLC, on behalf of Meridian International Center.

Before MCLEESE and DEAHL, *Associate Judges*, and NEBEKER, *Senior Judge*.

DEAHL, *Associate Judge*: This case concerns what qualifies as a private school under 11-X D.C.M.R. § 104 (2021). That regulation provides that private schools are eligible for a special exception to zoning regulations that otherwise restrict certain areas to residential housing. *Id.* More specifically, the question presented in this appeal is whether Meridian International Center, a self-described "premier nonprofit global leadership organization" that "offers educational and cultural exchange programs," qualifies as a private school eligible for that exception. The Board of Zoning Adjustment (BZA) found that it does, and therefore granted Meridian's application for a special exception, as requested by intervenor MIC9 Owner, LLC, on Meridian's behalf.[1] Meridian sought the exception in order to substantially modify its existing private school plan and build an eight-story, mixed-use condominium building with over 100 residential units, more than 9,000 feet of office and meeting space, and an underground parking garage on its current grounds. Notably, as the BZA found and nobody disputes, Meridian could build something roughly comparable "as a matter of right" even without the exception afforded to private schools.

---

[1] We generally refer to intervenor, MIC9 Owner, LLC, and Meridian International Center collectively as "Meridian."

Petitioners are residents of properties adjoining Meridian and they challenge the BZA's grant of the special exception, arguing that the record and the BZA's findings were insufficient to support the conclusion that Meridian is a private school. In their view, Meridian is not a school at all, but rather a private event center. They point out that the bulk of events hosted by Meridian are private rentals, such as weddings, and that any educational programming Meridian offers is peripheral to its core function: hosting and collecting fees from private events.

We agree with petitioners that the BZA's findings are inadequate to support the conclusion that Meridian is a private school. The record is lean, and the BZA's findings are virtually non-existent, on factors pertinent to whether Meridian is a school in any meaningful sense. There is no finding as to whether Meridian has a faculty, an enrolled student body, graduates, regularly scheduled classes, and the like. It is unclear if it is accredited as a school, charges tuition, or has a curriculum. While none of these factors is dispositive, we have previously described the inquiry into whether an organization is a school as a holistic assessment of "what goes on at [the purported school] on a daily basis." *See Neighbors on Upton St. v. District of Columbia Bd. of Zoning Adjustment*, 697 A.2d 3, 8 (D.C. 1997). Because the BZA's findings shed little light on that inquiry, we vacate the BZA's decision and remand the case.

In reaching that disposition, we reject intervenor's threshold argument that petitioners lack standing to appeal the BZA's order. We also reject petitioners' arguments that the BZA failed to accord "great weight" to concerns raised by affected Advisory Neighborhood Commission (ANC) 1C, as the BZA's findings demonstrate that it gave those concerns the requisite weight in reaching its decision. *See* D.C. Code § 1-309.10(d)(3)(A), (B) (2021 Supp.).

## I.

Meridian International Center is located in the 2300 block of 16th Street, N.W., across from Meridian Hill Park in the Meridian Hill Historic District. There are two historic mansions on its grounds, the White-Meyer House and Meridian House, both designed by the acclaimed architect John Russell Pope. The surrounding area contains a mixture of large mansions and apartment buildings. Meridian describes itself as "a premier nonprofit global leadership organization" that "offers educational and cultural exchange programs aimed at strengthening global engagement, preparing public and private sector leaders for a global future, and providing a forum for international collaboration across sectors." Meridian's application to the BZA states that it offers "experiential learning via tours and activities in other cities, as well as various training programs, expert panels, and

related events hosted at [Meridian]." Meridian also operates as a private event space, hosting events like weddings that provide funds to support its operations and maintenance costs. In 2017, which was the last full year before the BZA hearings on Meridian's application, Meridian held a total of 149 events. The record suggests most of those were "private rentals," including 39 weddings.

For more than sixty years Meridian has held a special exception, for zoning purposes, to have a private school on its grounds. *See* BZA Order No. 5802 (1960). In the BZA's 1960 order first authorizing Meridian (then known as the "Washington International Center") as a campus for a private school, the BZA described its expectations that the average number of students on Meridian's grounds would "be from 60 to 75 at any one time" with "hours of operation . . . from 9:00 a.m. to 5:00 p.m. [M]onday to Friday, and on certain evenings . . ." The BZA also restricted "[t]he number of dances to be held at the subject property . . . to the number normally scheduled by colleges and universities." From 1972 to the mid-80s, the Antioch School of Law—a predecessor of the University of the District of Columbia David A. Clarke School of Law—was housed on Meridian's campus. In 1987, shortly after Antioch School of Law closed its doors, the BZA approved an expansion of Meridian's campus into an adjoining lot under BZA Order No. 14571, and its order—like the 1960 order—described its expectations that the site would be used

for what sounds like a typical school. It approved Meridian as a "private school for adults," with "approximately 35 faculty and staff members" and an average of "18 to 20 student-visitors" who "will attend classes and programs on the site on a daily basis," with the school "generally . . . closed on the weekends and evenings," though "open occasionally." BZA Order No. 14571. In 2003, the BZA again approved Meridian's request to modify its private school plan, *see* BZA Order No. 17070, though in that instance its order said little about how Meridian would function as a private school. Its order referred in passing to a "school and cultural center" with little elucidation.

In the current proceedings, Meridian again seeks a special exception to modify its private school plan, requiring it to demonstrate that it continues to qualify as a private school eligible for a special exception under 11-X D.C.M.R. § 104.1. And because its property is "split-zoned," with different zoning requirements applicable to different parts of it, it also seeks to extend the more liberal regulations applicable to its "Residential Apartment 4" (RA-4) zone to its "Residential Apartment 2" (RA-2) zone. *See* 11-A D.C.M.R. § 207.2 (2021) (permitting as a special exception the extension of the "lesser restrictive use zone" in split-zoned lots). It sought those two exceptions so that it could build an eight-story, mixed-use condominium building with 111 to 115 units, along with a 9,266 square foot conference center, plus an

underground parking garage on its site. Meridian's application stressed its considerable community outreach to arrive at a proposal that neighbors would find acceptable. In particular, Meridian "engaged in meetings with ANC 1C and representatives of the Surrounding Property Owners and formed a working group of interested stakeholders led by a community facilitator." The working group and Meridian created three Memoranda of Understanding (MOUs) to address various concerns related to: (1) events held at the new conference center; (2) the new residential building; and (3) construction.

But the new development still faced considerable opposition from members of the surrounding community. ANC 1C, an automatic party to the proceedings because of its geographic proximity to the site, consistently raised its concerns with the BZA. It passed a pre-hearing resolution highlighting how, even prior to the proposed new development, Meridian's frequent events created noise, traffic, parking, and safety related concerns. The resolution stressed how previous efforts to ameliorate those concerns through an MOU between Meridian and surrounding neighbors had "not improved the problems caused by Meridian's events," so it predicted the new round of MOUs would prove similarly ineffective. ANC 1C also passed a post-hearing resolution, in which it argued that Meridian is not in fact a private school but rather a private event center. That echoed the hearing testimony

of ANC 1C Commissioner Amanda Fox-Perry who testified in opposition to the project. She noted that while Meridian was supposed to function "like a private school, it's functioning as a private event center, as much as anything else." She also echoed the ANC's concerns that Meridian had "consistently violated" a pre-existing MOU with surrounding neighbors. Other neighborhood residents likewise voiced their opposition to the project.

The BZA approved Meridian's application and granted the two requested exceptions, with some conditions. As to the complaints that Meridian is not in fact a school, the BZA noted that ANC 1C "failed to raise this issue at the hearing, where [Meridian] would have had an opportunity to directly address the question," yet it went on to confront the issue in roughly half-a-page of analysis. It concluded that Meridian was a private school, reasoning that it "offers educational and cultural exchange programs, including experiential learning as well as various training programs, expert panels, and related events focused on specialized instruction in international diplomacy and global leadership," so that it "clearly meets" the Webster's Unabridged Dictionary definition of a school as "an organization that provides instruction," including "an establishment offering specialized instruction."

Having found that Meridian is eligible for the exception as a private school, the BZA examined whether the new development was "likely to become objectionable to adjoining and nearby property because of noise, traffic, number of students," or other conditions. *See* 11-X D.C.M.R. 104.2. It concluded not, reasoning that the "proposed project, when taken as a whole, will not 'significantly increase objectionable qualities over their current levels in the area' or 'significantly increase objectionable qualities over the level that an alternative, as-of-right structure would likely create.'" It then issued specific and fairly detailed findings explaining why, in its view, the proposal would not have "objectionable or adverse effect[s] on surrounding properties" related to noise, traffic, parking, the number of people on the campus, or any "other objectionable impacts" such as pet waste, litter, or event attendee behavior.

The BZA also granted Meridian's request for a special exception to extend the RA-4 zoning portion of its lot to the portion zoned RA-2. It explained that the project's overall density would remain within the limits "otherwise permitted" without the exception, and that all the exception "does is shift density away from the Historic Mansions toward 16th Street, N.W., where height and density is concentrated in surrounding development." "The extension shall have no adverse effect upon the present character and future development of the neighborhood," it

concluded. The BZA attached certain conditions to its approval of the two special exceptions, many of which incorporated various terms from the MOUs between Meridian and the working group. Petitioners filed a timely notice of appeal.

## II.

Petitioners' primary contention on appeal is that the BZA's findings do not support its conclusion that Meridian is a private school and so it was not eligible for a special exception under 11-X D.C.M.R. § 104. They also argue that the BZA did not give ANC 1C's concerns about the project's adverse effects on traffic, parking, noise, and the like, the requisite "great weight." D.C. Code § 1-309.10(d)(3)(A) (providing that ANC's recommendations "shall be given great weight" by District agencies). Before addressing those claims, however, we first consider Meridian's threshold argument that these petitioners lack standing to bring their challenge to the BZA's approval of Meridian's application. We disagree and conclude they have standing to maintain this appeal.

While the District of Columbia courts were established under Article I of the Constitution, rather than Article III, we generally follow "the constitutional standing requirement embodied in Article III." *Grayson v. AT&T Corp.*, 15 A.3d 219, 224 (D.C. 2011) (en banc); *but see id.* at 235 n.38 (noting mootness as "one area in which

we have not followed strictly federal justiciability requirements"). To satisfy Article III's strictures, petitioners must demonstrate an actual or imminent "injury that is concrete and particularized," that is "fairly traceable to the challenged conduct," and that is "likely to be redressed by a favorable judicial decision." *Little v. SunTrust Bank*, 204 A.3d 1272, 1274 (D.C. 2019) (citation omitted). Meridian maintains that petitioners fail on the first and third prongs of that test. They argue that petitioners' harms are too speculative and generalized to be cognizable injuries under the first prong, and that petitioners have not shown a remand to the BZA would alleviate or "redress" their injuries under the third prong.

We conclude that petitioners have adequately demonstrated an imminent injury sufficient to maintain their appeal. Petitioners all live very close to Meridian and its proposed new development. Twelve of the thirteen petitioners are residents of the Beekman Place Condominiums, located across the street and about 45-60 feet from the proposed development, while the thirteenth lives similarly close by and across the street. Petitioners allege a number of harms the proposed project would inflict on their daily lives including increased noise, congestion, traffic, as well as a loss of parking. We have previously held that anticipated harms of just this type are sufficient, for standing purposes, to challenge zoning approvals of a proposed project. For instance, in *Union Mkt. Neighbors v. District of Columbia Zoning*

*Comm'n* (*Union Market II*), we held that petitioner had standing to challenge a new development project where its members "lived within 200 feet of the development" and had "expressed concerns about air pollution, traffic, noise, parking, destabilization of land values, and the impact of this development on the community values they enjoyed." 204 A.3d 1267, 1269 n.2 (D.C. 2019).

Meridian counters with *York Apartments Tenants Ass'n v. District of Columbia Zoning Comm'n* (*YATA*), where we found the petitioner's claims "amount[ed] to nothing more than an allegation of the right to have the Zoning Commission act in accordance with its rules and regulations." 856 A.2d 1079, 1084 (D.C. 2004). But unlike in that case, where the petitioner "fail[ed] to articulate a concrete and specific threat or injury," *id.* at 1085, here we have more specifics. For instance, one petitioner testified at the BZA hearing that "the extra traffic and congestion will become a life threatening situation," pointing out that the intersection of Belmont and 16th Streets "is dangerous on a good day, but this project will only exacerbate the issues." Moreover, *YATA* concerned only a modification of a previously approved "office/condominium structure" into a "classroom/dormitory structure," where there was no suggestion that the latter use would increase traffic, noise, congestion, or the like; petitioner made only vague allusions to the impact on its members "quiet enjoyment of their homes," "without explication." 856 A.2d at

1085. We have previously distinguished *YATA* in a case like this one, where "the sheer size and bulk of the extensive project being proposed" renders petitioners' alleged injuries far from conjectural. *Union Mkt. Neighbors v. District of Columbia Zoning Comm'n*, 197 A.3d 1063, 1067 n.3 (D.C. 2018) (*Union Market I*).

Meridian also argues that petitioners alleged harms will not be redressed by a favorable ruling because their requested relief of remanding to the BZA may ultimately leave them in the same position. In its words, "remanding the case so that the BZA could more fully explain its reasons" for granting the application would not "necessarily address their alleged general injuries." That is true, however, petitioners are not simply seeking further elucidation of the BZA's reasoning, but an outright reversal of it. At bottom, their argument on appeal is that Meridian "is not a private school" at all, just as ANC 1C argued before the BZA, and if they are successful in pressing that claim, their harms will be redressed by a denial of Meridian's application for a special exception to modify its private school plan. In order to satisfy the redressability requirement, petitioners need only show "a *likelihood*, as opposed to mere speculation, that an injury will be redressed by a *favorable* decision." *Grayson*, 15 A.3d at 246 (emphases added, citation omitted, internal quotation marks omitted). They have shown that here.

Finally, in a footnote, Meridian suggests that because "the underlying zoning permits multifamily condominiums as a matter of right," petitioners lack standing because Meridian could build something of comparable size and density without resort to the special exception for private schools. But when conducting a standing analysis, petitioners need only show that they were injured by what the BZA did as compared to what it should have done in this proceeding. *Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426, 441 (D.C. Cir. 1998) ("[T]he proper comparison is between what the agency did and what the plaintiffs allege the agency should have done under the statute."). In other words, they need only show that the grant of Meridian's application injured them as compared to their alternative, that the application should have been denied. They have done that, and we will not attempt to measure the alleged harm against all hypothetical futures of what Meridian may ultimately do in future proceedings if petitioners are successful in this one.[2]

---

[2] In addition to arguing that petitioners do not have standing under Article III, Meridian argues that they also do not have prudential standing. The two arguments are identical in substance, as Meridian merely repackages the same complaints that petitioners allege too general an injury, and too speculative a hope of redress, to satisfy the test for prudential standing. We therefore reject Meridian's prudential standing arguments for the same reasons we reject its Article III standing arguments.

**III.**

We now turn to the heart of this appeal, which is whether the BZA erred in concluding that Meridian is a private school. Our review of a decision of the BZA is "limited and narrow." *Embassy Real Est. Holdings, LLC v. District of Columbia Mayor's Agent for Hist. Pres.*, 944 A.2d 1036, 1050 (D.C. 2008) (internal quotation marks omitted). We will uphold its "decision if the findings of fact are supported by substantial evidence in the record considered as a whole and the conclusions of law flow rationally from these findings." *Kalorama Heights Ltd. P'ship v. District of Columbia Dep't of Consumer & Regul. Affs.*, 655 A.2d 865, 868 (D.C. 1995) (citing D.C. Code § 1-1510(a)(3)(E) (1992 Repl.)). The BZA's conclusions "must be sustained unless they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *George Washington Univ. v. District of Columbia Bd. of Zoning Adjustment*, 831 A.2d 921, 931 (D.C. 2003) (internal quotation marks omitted) (citing D.C. Code § 2-510(a)(3)(A) (2001)).

The BZA's analysis of whether Meridian qualifies as a private school was fairly cursory. It reasoned that the term private school is not defined in the zoning regulations, so that the "definition provided in Webster's Unabridged Dictionary" applies. 11-B D.C.M.R. § 100.1(g). Without citation to any particular version of

Webster's, the BZA recounted that Webster's defines "school" as "'an organization that provides instruction,' including among other things, 'an establishment offering specialized instruction.'"[3]  It concluded that Meridian "clearly meets this definition as an organization that offers specialized instruction on global leadership and international diplomatic issues," because it "is a nonprofit organization that offers educational and cultural exchange programs, including experiential learning as well as various training programs, expert panels, and related events focused on specialized instruction in international diplomacy and global leadership."  The BZA found support for its conclusion in this court's opinion in *Neighbors on Upton*, which appears to be the only case in which we have previously opined on the question of what qualifies as a private school eligible for this special exception.  697 A.2d at 7-8.  The BZA described *Neighbors on Upton* as embracing a "broad" definition of

---

[3] This definition appears to be from Webster's Online Dictionary, which supplies a different definition of "school" than recent printed unabridged dictionaries from Webster's.  *Compare School, Merriam-Webster Dictionary Online*, https://www.merriam-webster.com/dictionary/school; https://perma.cc/MQ64-26TW (last visited Oct. 14, 2021), *with School, Webster's Third New International Dictionary Unabridged* (2002).  But no party takes issue with that imprecision—petitioners themselves cite only to the online version of Webster's—and we do not think the differences are material to our disposition of this appeal.  On remand, however, the BZA may wish to address or cure the discrepancy.

private school "encompass[ing] non-traditional educational institutions, such as a school of music."

While that is perhaps a fair description of *Neighbors on Upton*, we have never embraced the virtually unbounded definition of the term private school that the BZA applied in the proceedings below. As we explained in *Neighbors on Upton*, analyzing whether an entity is operating as a private school requires scrutinizing "what goes on at the [purported school] on a daily basis." 697 A.2d at 8. In that case, we observed that the music school in question: (1) was "one of only seventeen schools in the nation accredited as 'community music schools' by the National Association of Schools of Music," (2) that its "classes are designed for all ages and all levels of skill," (3) that it has "a faculty of 98 professionally trained musicians who teach at the school," (4) that it has a "total student enrollment"—across "Early Childhood Music," "Preparatory" and "Adult" divisions—of 1500 students, (5) that it has "graduates," "the great majority" of whom do not go on "to performing careers," so that (6) "in its daily operations," it could be said to "provide[] music education in a broad sense rather than training for a business or profession." *Id.* at 5-8.

The functional approach we used to determine that the music school in *Neighbors on Upton* was indeed a private school stands in stark contrast to the BZA's analysis in this case. If all institutions that provide any degree of specialized instruction qualify as a private school—as the BZA seemed to reason—then any restaurant or retailer that trains new employees through "specialized instruction" would clear that bar.[4] Any family home where parents provide instruction to their children, or happen to themselves watch an occasional TED Talk or Masterclass, would satisfy that test. Our own courthouse, where clerks, attorneys, and judges alike receive a variety of specialized instruction on a regular basis, would be a school under the BZA's approach. Such conclusions would run contrary to the principle that "counterintuitive definitions are a bane" when interpreting the terms of statutes and regulations. *Sivaraman v. Guizzetti & Assocs., Ltd.*, 228 A.3d 1066, 1075 (D.C.

---

[4] Notably, the special exception at issue in *Neighbors on Upton* now appears as 11-U D.C.M.R. § 203(m) (2021), and it expressly excludes "trade school[s]" from that exception, whereas 11-X D.C.M.R. § 104 does not expressly exclude trade schools. Neither the BZA nor the litigants have attached any significance to that distinction. Rather, the BZA purported to track *Neighbors on Upton*'s analysis of what qualified as a private school, and the parties before us agree that *Neighbors on Upton* provides the pertinent test. Meridian, for instance, defends the BZA's analysis on the grounds that it "carefully tracked this court's analysis in *Neighbors on Upton*." While there is perhaps an argument that a trade school might qualify for a special exception under 11-X D.C.M.R. § 104.1, but not under 11-U D.C.M.R. § 203(m), nobody has raised that argument before us, nor has Meridian suggested it is operating a trade school.

2020). They would also run contrary to our functional approach to determining whether an entity is a school. *See Neighbors on Upton*, 697 A.2d at 7-8

The record and the BZA's findings are virtually non-existent on factors relevant to evaluating whether Meridian is in fact operating a school "in its daily operations," so that it could be said to be providing an "education in a broad sense" of that word. *Neighbors on Upton*, 697 A.2d at 8 (citation omitted). On the scant record before us, we simply do not know whether and to what extent Meridian is accredited, charges tuition, or has an enrolled student body, graduates, a faculty, regularly scheduled classes, or a curriculum. What little the BZA did determine— that Meridian offers *some* "specialized instruction on global leadership and international diplomatic issues"—is not enough to conclude that it is actually a school without a more complete record of what goes on at Meridian on a daily basis.

Giving us additional concern is that there is considerable evidence in the record that Meridian is not in fact operating a school in any ordinary or functional sense. While we do not know what fraction of Meridian-hosted events might be described as school-based or even educational, the record evidence is that of the 149 events that it hosted in the year before the BZA hearing, 87 of them were "private rentals," including "39 weddings." ANC 1C Commissioner Fox-Perry testified at

the hearing that Meridian is not operating as a private school as envisioned in the BZA's prior approvals, but is instead "functioning as a private event center." That view was echoed by at least one member of the BZA who, despite voting to approve Meridian's application, described it as "an event facility in a residential neighbor[hood]."

Meridian presses one final argument in defense of the BZA's ruling, which is that the BZA's prior rulings approving Meridian to operate as a school essentially tied its hands, because it "lacked any legal or factual basis to revoke Meridian's categorization as a private school." We disagree. For starters, we have never confronted the question whether Meridian is a private school, so to whatever extent the BZA's prior rulings on that topic were binding on it, they do not bind us. Moreover, part of the argument before the BZA was that Meridian was not operating in conformity with the BZA's prior orders, which generally did describe an expectation that Meridian would operate as a private school. *See* BZA Order No. 5802 (1960) (depicting the average number of students on Meridian's grounds as being "from 60 to 75 at any one time" with "hours of operation . . . from 9:00 a.m. to 5:00 p.m. [M]onday to Friday, and on certain evenings"); BZA Order No. 14571 (1987) (describing "approximately 35 faculty and staff members" and an average of "20 student-visitors" who "will attend classes and programs on the site on a daily

basis" with the school "generally" closed on the weekends and evenings). If it is true that Meridian is not conforming to those prior approvals, that is more than sufficient reason for the BZA to revisit its classification of Meridian as a school. *See Gorgone v. District of Columbia Bd. of Zoning Adjustment*, 973 A.2d 692, 696 (D.C. 2009) ("[F]ailures of prior zoning administrations" to adhere to zoning regulations "do not bind the hands of zoning administrators who later wish to give the law its full effect, at least where, as here, there is no viable claim of laches, estoppel, or the like.").

We therefore vacate the BZA's order granting Meridian's application and remand for further proceedings related to the question whether Meridian is operating a private school. We leave it to the BZA whether, on remand, to reopen the record for further factual development given that ANC 1C "failed to raise this issue at the [BZA] hearing."[5] On remand, the BZA should make more complete findings about

---

[5] Meridian argues that "neither petitioners nor anyone else appearing before the BZA or otherwise participating in the proceeding below questioned Meridian's status as a private school prior to or during the hearing before the BZA." We disagree with that description, where Commissioner Fox-Perry raised the point at the hearing that Meridian was not functioning "like a private school," but "as a private event center." But even if it were accurate, the issue is sufficiently preserved and properly before us because the BZA itself affirmatively addressed it in its own ruling. *See, e.g., Rodriguez v. District of Columbia Off. of Emp. Appeals*, 145 A.3d 1005, 1010 n.6 (D.C. 2016) ("Even if a claim was not pressed below, it properly may

what goes on at Meridian on a daily basis, regarding both its purportedly educational purposes, and the extent to which it operates as a private event facility. That is necessary both to inform its own inquiry into whether Meridian is a private school, and to permit our review of that question.

**IV.**

Finally, we address petitioners remaining claim that the BZA failed to give the requisite "great weight" to ANC 1C's concerns related to the proposed project. Petitioners argue that ANC 1C raised substantial concerns that allowing the project to go forward would be "objectionable to adjoining and nearby property because of noise, traffic, number of students, or otherwise objectionable conditions," and that the BZA did not give those concerns adequate consideration. *See* 11-X D.C.M.R. § 104.2 (exception for a private school shall be granted if "it is not likely to become objectionable to adjoining and nearby property because of noise, traffic, number of students, or otherwise objectionable conditions"); 11-A D.C.M.R. § 207.2 (special exception for the extension of the "lesser restrictive use zone" requires finding that "extension shall have no adverse effect upon the present character and future

---

be addressed on [review] so long as it was passed upon.") (quoting *Littlejohn v. United States*, 73 A.3d 1034, 1038 n.3 (D.C. 2013)).

development of the neighborhood"). Even if Meridian is a private school, the argument goes, the BZA should have denied its application based on the ANC's expressed concerns, or at the very least the BZA should have given those concerns more careful consideration.

"By law, the BZA must give 'great weight' to 'issues and concerns raised in the recommendations' of an affected advisory neighborhood commission and must 'articulate with particularity and precision the reasons why the [ANC] does or does not offer persuasive advice under the circumstances.'" *Citizens for Responsible Options v. District of Columbia Bd. of Zoning Adjustment*, 211 A.3d 169, 184 (D.C. 2019) (quoting D.C. Code § 1-309.10(d)(3)(A), (B) (2018 Supp.)). This means that "when the BZA decides to pursue a path inconsistent with an ANC's recommendations, it 'must acknowledge [the ANC's] concerns and articulate reasons why those concerns and issues were rejected and [why] the relief requested from the zoning regulations was granted.'" *Id.* (quoting *Metropole Condo. Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 141 A.3d at 1079, 1087 (D.C. 2016)). At the same time, though, the BZA "is not required to exhaustively discuss every detail in the ANC's submission, or to defer to the ANC's views." *Id.*

Petitioners focus on two sets of concerns they claim the BZA failed to accord great weight to: (1) ANC 1C's view that the MOUs would not adequately mitigate the negative impacts of the project, and (2) its view that the project would violate the so-called Comprehensive Plan.[6]  We disagree and find the BZA afforded great weight to the ANC's concerns about both issues.

*A. The ANC's Concerns About the Effectiveness of the MOUs*

In both its pre-hearing and post-hearing resolutions, ANC 1C raised its concerns that the MOUs negotiated between Meridian and a working group from the surrounding community would prove ineffectual.  ANC 1C objected in its pre-hearing resolution that a pre-existing "MOU has not improved problems caused by events" and "violations are routinely observed by neighboring residents."  In its post-hearing resolution, it likewise "reiterate[d] that the MOU provisions do not address the fundamental impacts raised in the prior ANC resolution."  It explained "[t]he impacts of this project will be substantial and cannot be fully mitigated by the

---

[6] The Comprehensive Plan "establishe[d] a broad framework intended to guide the future land use planning decisions for the District." *Durant v. District of Columbia Zoning Comm'n*, 65 A.3d 1161, 1162 n.1 (D.C. 2013) (internal citation omitted); *see also Cummins v. District of Columbia Zoning Comm'n*, 229 A.3d 768, 771 (D.C. 2020).

MOUs." A variety of the MOUs' terms were ultimately incorporated as conditions of the BZA's order approving Meridian's application. Petitioners now contend that the BZA was wrong to treat a new round of MOUs as mitigating petitioners' well-founded concerns.

Over the course of its fifty-page Order, the BZA went through each of the ANC 1C's complaints related to the MOUs and their ability to negate any adverse impacts of the proposal on the surrounding neighbors. As the BZA explained:

> The Meridian MOU and the Residential MOU developed by the Applicant and the Surrounding Property Owners each include extensive provisions to address any existing or potential noise impacts of the Center and the Project, including noise impacts related to loading and deliveries, the number, timing, and size of the Center's events, arriving/departing guests, and amplified music at such events. As one representative of the Surrounding Property Owners stated, the agreements would ensure "peace, order, and quiet." (Exhibit 83.) Restrictions in the MOUs have also been substantially incorporated as conditions to this Order. In addition to being enforceable conditions of the Order, the MOUs provide procedures for enforcement actions to address ongoing violations, if any occur.

The BZA similarly addressed concerns related to vehicle operations, traffic and the Belmont/16th Street intersection, parking, noise, the number of visitors at Meridian, construction impacts, and a number of other adverse impacts like litter, trash, pet waste, storm water management, and snow removal.

The BZA "acknowledge[d] the ANC's concerns regarding the effectiveness of the current MOU between [Meridian] and the surrounding neighbors." It simply found that the new MOUs "include[d] much more robust enforcement measures to ensure compliance as compared to the current MOU," and determined the reporting, staffing, and enforcement were adequate to enforce the provisions of the new round of MOUs, whatever the utility of the pre-existing one. In particular, the BZA mandated that "as an additional protective measure, this Order imposes a five-year term on approval of [Meridian's] new office and meeting space, after which period the [BZA] will have the opportunity to reassess whether the MOUs have been effective in mitigating objectionable impacts." The BZA quoted ANC 1C which "acknowledged that the level of detail and improved enforcement mechanisms in the MOUs were 'laudable.'"

We are satisfied that the BZA gave the ANC's concerns great weight and addressed them with particularity. The BZA's comprehensive response to the ANC's concerns spanned seven pages, counting conservatively. In those pages the BZA went point-by-point through the ANC's various concerns and explained its reasons for granting the application over ANC 1C's objections. *Cf. Union Mkt. II,* 204 A.3d at 1269 n.1 (in a different context, noting the Zoning "Commission paid careful attention to the concerns raised by" petitioner where its "order devoted nearly

five pages to a point-by-point discussion of issues that [petitioner] had identified in writing"). The BZA was required to acknowledge the ANC's concerns and articulate its reasons for rejecting them, *Citizens for Responsible Options*, 211 A.3d at 184, and it did that here. While the BZA was not required to "exhaustively discuss every detail in the ANC's submission," *id.* (citation omitted), it came reasonably close to doing just that.

*B. The ANC's Concerns About the Comprehensive Plan*

The BZA also gave the requisite weight to ANC IC's concerns related to the so-called Comprehensive Plan. "The Comprehensive Plan is a legislative enactment establishing a 'broad framework intended to guide the future land use planning decisions for the District.'" *Cummins v. District of Columbia Zoning Comm'n*, 229 A.3d 768, 771 (D.C. 2020) (quoting *Wisconsin-Newark Neighborhood Coal. v. District of Columbia Zoning Comm'n*, 33 A.3d 382, 394 (D.C. 2011)); *see also Durant v. District of Columbia Zoning Comm'n*, 65 A.3d 1161, 1162 n.1 (D.C. 2013).

At the outset, in response to the ANC's objections that the project was inconsistent with the policies and goals of the Comprehensive Plan, the BZA indicated that it has "no power to implement the Comprehensive Plan," as this court

said in *Tenley & Cleveland Park Emergency Comm. v. District of Columbia Bd. of Zoning Adjustment*, 550 A.2d 331, 341 n.22 (D.C. 1988). Petitioners contend, however, that they were not asking the BZA to *implement* the Comprehensive Plan, but instead to merely ensure that the proposed project complied with the Comprehensive Plan before approving Meridian's application. They make a good point. While we have said that "[t]he BZA and the Zoning Administrator have no power to implement the Comprehensive Plan," *id.*, we made that statement in the context of finding that the BZA does "not have the power *to amend* any [zoning] regulation or map." *Id.* at 341 n.22 (emphasis added).

Petitioners did not ask the BZA to amend any zoning regulation or map, however. They instead asserted that Meridian's application "should be assessed in accordance with the relevant portions of the Comprehensive Plan" and that the BZA should deny the application because it "does not comply with the Comprehensive Plan." We have said that the BZA "is required to look to . . . the Comprehensive Plan for general policy guidance in passing upon applications." *Miller v. District of Columbia Bd. of Zoning Adjustment*, 948 A.2d 571, 579 (D.C. 2008) (quoting *Nat'l Cathedral Neighborhood Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 753 A.2d 984, 986 (D.C. 2000)) (internal quotation marks omitted). Moreover, the BZA is required by regulation to ensure a special exception "[w]ill be in harmony

with the general purpose of the Zoning Regulations and Zoning Maps." 11-X D.C.M.R. § 901.2(a). And in the implementation section of the Comprehensive Plan, the BZA is directed to "consider the goals and policies of the District Elements in the approval of" special exceptions. 10-A D.C.M.R. § 2502.9 (2021); *see also* 10-A D.C.M.R. § 2504.5 ("Requir[ing] the Board of Zoning Adjustment, the Zoning Commission, the Zoning Administrator, and other District agencies or decision making bodies regulating land use to look to the District Elements of the Comprehensive Plan and its accompanying Maps."). We therefore think the BZA was wrong to the extent it rejected the ANC's concerns on the grounds that it had no power to implement the Comprehensive Plan, because ensuring compliance with the Comprehensive Plan is in fact part of its task when reviewing applications for special exceptions.

We nonetheless conclude that the BZA complied with that duty here. As the BZA ultimately noted, the ANC's arguments for why the project ran afoul of the Comprehensive Plan merely reiterated the various concerns it had discussed at length and rejected, as detailed above in Part IV.A. After indicating that it had no obligation to implement the Comprehensive Plan, the BZA noted that "[i]n any event," it had already "undert[aken] a detailed evaluation of the noise, traffic, parking, design, and other impacts of the Project" animating the ANC's

Comprehensive Plan-based concerns, and found those concerns did not warrant rejecting the application. Similarly, the BZA had already addressed the project's compliance with the Comprehensive Plan's historic preservation goals as it specifically noted both the Historic Preservation Office and the Historic Preservation Review Board had undertaken an extensive review and approved the project. While we think the BZA incorrectly suggested it had no obligation to consider the application's adherence to the Comprehensive Plan, we are ultimately satisfied with its conclusion that, in any event, the project did not run afoul of the Comprehensive Plan.

## V.

The judgment of the BZA is vacated and we remand for further proceedings consistent with this opinion.

*So ordered.*