*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-AA-0360

FRIENDS OF THE FIELD, PETITIONER,

v.

DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, RESPONDENT,

and

THE MARET SCHOOL, INTERVENOR.

On Petition for Review of an Order
of the District of Columbia Board of Zoning Adjustment
(BZA Case No. 20643)

(Argued June 4, 2024                    Decided August 29, 2024)

*Jonathan G. Axelrod*, with whom *Edward Donohue* was on the briefs, for petitioner.

*Eugene A. Adams*, Director of the Mayor's Office of Legal Counsel, filed a statement in lieu of brief for respondent.

*Gary M. Ronan*, with whom *Paul A. Tummonds, Jr.* and *Joel E. Antwi* were on the brief, for intervenor.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH and SHANKER, *Associate Judges*.

SHANKER, *Associate Judge*: The District of Columbia Board of Zoning

Adjustment ("BZA") granted an application for special exceptions filed by

intervenor the Maret School, permitting the school to construct athletic facilities on property located in a residential zone. Petitioner Friends of the Field, a coalition of residents living in the vicinity, opposed Maret's application and seeks review of the BZA's order. Friends contends, in summary, that (1) the BZA erroneously concluded that Maret's athletic facilities constitute a principal use of a private school; and (2) the BZA acted arbitrarily and capriciously because it failed to adequately address whether the use of artificial turf will cause adverse health impacts, whether the appearance of the facilities will create adverse visual impacts, and whether additional conditions limiting the use of the facilities were warranted. We disagree with all of Friends's contentions and affirm. We hold that (1) athletic facilities may constitute an educational use, and, therefore, a principal use of a private school, and (2) the BZA adequately addressed whether objectionable conditions were likely to occur and which conditions were appropriate in granting Maret's special exceptions.

## I. Background

### A. Factual Background

The BZA made the following findings. The property at issue is located at 5901 Utah Avenue, NW, in a residential zone (R-1B). Since 1930, the Episcopal Center for Children has owned the property and used it as a playing field and open

space for students attending its day school, which is located on an adjacent lot. In 2019, the Episcopal Center suspended its operations, and in 2021, it entered into an agreement with the Maret School, a private school located at 3000 Cathedral Avenue, N.W., that serves approximately 650 students enrolled in kindergarten through twelfth grade. The agreement allows Maret to lease the property for up to fifty years and to develop athletic facilities on the site.

## B.    Procedural History

Maret requested special exceptions under 11-U D.C.M.R. § 203.1(m), 11-X D.C.M.R. § 104, and 11-C D.C.M.R. § 710.3 to construct athletic facilities and a parking lot for private school use on the property. As part of its application, Maret described athletics as an "integral component of its educational and academic instruction and mission."

The proposed athletic facilities will feature a baseball diamond and a multipurpose athletic field for football, soccer, and lacrosse. Maret will implement a schedule for student practices and games at the athletic facilities. At designated times, the facilities will be available for use by other schools, youth sports organizations, and the community. Maret will allow youth sports organizations to rent the proposed facilities in a manner consistent with the rental policies for Maret's main-campus athletic facilities.

As part of its proposal, Maret indicated that it will install several other structures and improvements to the property—including netting around the baseball diamond and multipurpose field, a picket fence around the perimeter, and retaining walls—and will implement a transportation management plan to facilitate access to and from the property and mitigate the effects of the proposed development.

The District of Columbia Office of Planning recommended approval of Maret's application subject to conditions that require Maret to install shrubbery along the parking lot to minimize visual impacts and prohibit the use of sound amplification devices, music, and other sound instruments. The District of Columbia Department of Transportation ("DDOT") did not object to the approval of Maret's application, subject to certain conditions. The Advisory Neighborhood Commission ("ANC") adopted a resolution in support of Maret's application, also subject to various conditions, and entered into a memorandum of understanding with Maret that reflected Maret's agreement to implement those conditions.

The District of Columbia Office of the Attorney General submitted comments in opposition, arguing that approval of the application would be against the public interest because the proposed facilities were "a commercial-scale high-intense use" prohibited in the residential zone. Friends also opposed Maret's proposal, asserting that the planned "multi-sports complex" would be incompatible with the surrounding

neighborhood and would create adverse impacts relating to traffic, parking, noise, the appearance of the facilities, and the environment.

The BZA held a hearing with testimony from Maret's leadership, a traffic expert, and others who supported Maret's proposal. Friends presented testimony from its members, an acoustics expert, and two individuals who addressed the use of artificial turf.

In a written decision and order, the BZA addressed, as a preliminary matter, Friends's argument that because the athletic facilities did not support academic development, they did not constitute a principal private school use and did not therefore provide a proper basis for Maret's special exception request. The BZA disagreed, concluding that under 11-B D.C.M.R. § 200.2(k)(1), "athletics [are] a form of education when athletic facilities are operated as an integral component of a [principal] private school use," and that this was true at Maret.

Concerning Maret's special exception requests under 11-U D.C.M.R. § 203.1(m) and 11-X D.C.M.R. § 104, the BZA concluded that Maret's planned use "will not create objectionable impacts" with respect to adjoining and nearby properties because of noise, traffic, the number of students, or other objectionable conditions. The BZA also determined that Maret was eligible for special exception relief from the applicable parking location restrictions under 11-C D.C.M.R.

§ 710.3. Finally, the BZA concluded that granting Maret's application, given the limits of Maret's planned use and subject to several conditions adopted in its order, would be consistent with the requirements of 11-X D.C.M.R. § 901.2. This was so because the planned use "will be in harmony with the general purpose and intent of the Zoning Regulations and Zoning Map" and will not adversely affect the use of neighboring properties. The BZA therefore approved Maret's requests for zoning relief.

This petition for review followed.[1]

## II.    Standard of Review

"Our review of the Board of Zoning Adjustment's decisions is generally deferential." *McDonald v. D.C. Bd. of Zoning Adjustment*, 291 A.3d 1109, 1115 (D.C. 2023). "We will not reverse the [BZA's] decision unless its findings and conclusions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of its jurisdiction or authority; or unsupported by

---

[1] Before Friends filed its petition for review, Maret moved for clarification/reconsideration of the conditions in the BZA's order, seeking the inclusion of additional "proposed restrictions and limitations" concerning "the use and design of the athletic facilities" so that they could be "easily discerned by the Office of the Zoning Administrator of the Department of Buildings." Friends opposed and moved to stay the BZA's order, which Maret opposed. The BZA denied Maret's motion for clarification/reconsideration because the BZA's order had been appealed to this court and denied Friends's motion to stay.

substantial evidence in the record . . . ." *Id.* (internal quotation omitted). We "consider whether the findings made by the BZA are sufficiently detailed and comprehensive to permit meaningful judicial review of its decision." *Sheridan Kalorama Hist. Ass'n v. D.C. Bd. of Zoning Adjustment*, 229 A.3d 1246, 1255 (D.C. 2020) (internal quotation omitted). "If the agency makes no finding of fact on a material contested issue, this court on review may not fill the gap by making its own determinations from the record, but must remand the case." *Levy v. D.C. Bd. of Zoning Adjustment*, 570 A.2d 739, 746 (D.C. 1990) (internal quotation omitted).

The BZA's interpretation of the zoning regulations is owed deference, "unless it is plainly erroneous or inconsistent with the regulations." *Comm. of Neighbors Directly Impacted by LAMB Application v. D.C. Bd. of Zoning Adjustment*, 218 A.3d 739, 742 (D.C. 2019) (internal quotation omitted). "While we accord deference to a reasonable agency interpretation of its regulation, ultimately, we review the legal conclusions of the agency de novo." *Id.* (internal quotation omitted).[2]

---

[2] This case was argued before *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024), was decided, and our holding concerning the zoning regulation at issue would be the same even on de novo review. That said, "[w]e reserve judgment on any potential impact of *Loper Bright Enterprises . . .* on our well established deference to an agency's interpretation of a relevant statute and regulations." *Vornado 3040 M St., LLC v. District of Columbia*, No. 22-TX-0434, 2024 WL 3529437, at *7 n.7 (D.C. July 25, 2024) (internal quotation and alterations omitted).

### III. Analysis

Friends raises two claims in its petition for review: (1) the BZA erroneously concluded that Maret's athletic facilities constitute a principal private school use; and (2) the BZA failed to adequately address certain objectionable conditions and consider additional community-friendly conditions limiting third-party use. We disagree and affirm.

### A. Principal or Accessory Use

Because the subject property was located in a residential zone, Maret needed, and the BZA granted, special exceptions under 11-U D.C.M.R. § 203.1(m) and 11-X D.C.M.R. § 104 to permit the construction of athletic facilities on the property for private school use. On appeal, Friends maintains that the BZA acted arbitrarily and capriciously in concluding that the athletic facilities constitute a principal private school use because (1) Maret's athletics are not educational and the use would be semi-commercial in nature given Maret's plans to lease the facilities to third parties, and (2) 11-B D.C.M.R. § 200.2(k)(2) classifies athletic facilities as an accessory use. We hold that under Section 200.2(k)(1), Maret's athletics constitute an educational use despite Maret's plans to lease its facilities to third parties on a limited basis and that Section 200.2(k)(2) does not constrain athletic facilities to accessory uses. Accordingly, we affirm.

### 1.     Athletics May Constitute an Educational Use Under Section 200.2(k)(1)

11-X D.C.M.R. § 104 permits special exceptions for private educational uses in an area otherwise zoned for residential housing.   11-B D.C.M.R. § 200.2(k)[3] defines private education use as follows:

> (k) Education, Private:
>
> (1) An educational, academic, or institutional use with the primary mission of providing education and academic instruction that provides District or state mandated basic education or educational uses;
>
> (2) Above uses may include, but are not limited to: accessory play and athletic areas, dormitories, cafeterias, recreational, or sports facilities; and
>
> (3) Exceptions: This use category does not include uses which more typically would fall within the daytime care, public education or college/university education use category.   This use category also does not include the home schooling of children in a dwelling by their parent, guardian, or private tutor.

11-B D.C.M.R. § 100.2 states that a use can be either accessory or principal:

> Use, Accessory: A use customarily incidental and subordinate to the principal use and located on the same lot with the principal use.  Except for Short-Term Rentals and unless otherwise specifically permitted, an accessory use shall be limited to twenty percent (20%) of the gross floor area.

---

[3] We cite the 2020 version of this regulation because that version was in force at the time of the BZA's decision.

> Use, Principal: The primary purpose or activity for which
> a lot, structure, or building is occupied.

The parties agree that an educational use by a private school would constitute a principal use. Thus, if Maret's proposed athletic facilities on the lot are an "educational use," they constitute a principal use and are not restricted to the size and geographic limitations for an accessory use. *See* 11-B D.C.M.R. §§ 100.2 (with some exceptions, "an accessory use shall be limited to twenty percent (20%) of the gross floor area"); 200.2(k) (stating that an educational use has "the primary mission of providing education and academic instruction that provides District or state mandated basic education or educational uses"). Friends contends, however, that Maret's proposed athletic facilities are not educational because they do not serve an academic purpose and the use by non-Maret students is semi-commercial. In response, Maret argues that athletics are a core component of modern-day education, particularly at Maret, where athletics are one of the four pillars of its educational mission and satisfy a requirement for graduation. We affirm the BZA's conclusion that Maret's athletic facilities constitute an "educational use."

First, the plain language of 11-B D.C.M.R. § 200.2(k)(1) does not limit an educational use to purely academic pursuits.[4]  Many courts have recognized that education is not limited to classroom academic instruction; it also includes learning that fosters the social, moral, and physical development of students.  *See, e.g.*, *Comm'rs of D.C. v. Shannon & Luchs Const. Co.*, 17 F.2d 219, 220 (D.C. Cir. 1927) ("[A] modern educational institution embraces those things which experience has taught us are essential to the mental, moral, and physical development of the pupils.");[5] *Albach v. Odle*, 531 F.2d 983, 985 (10th Cir. 1976) (noting that the educational process "includes innumerable separate components, such as participation in athletic activity and membership in school clubs and social groups, which combine to provide an atmosphere of intellectual and moral advancement").

---

[4] When a term is undefined, the zoning regulations direct the BZA to use the dictionary definition.  11-B D.C.M.R. § 100.1(g) ("Words not defined in this section shall have the meanings given in Webster's Unabridged Dictionary.").  The relevant definition of education is broad and not limited to academics.  Entry 2a defines education as "a process or course of learning, instruction, or training that educates or is intended to educate . . . *especially* : a formal course of instruction or training offered by an institution (such as a college) primarily designed to provide an education."  *Education*, Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/education.

[5] Decisions of the United States Court of Appeals for the District of Columbia Circuit rendered before February 1, 1971, are binding on this court. *M. A. P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).

Accordingly, athletics and athletic facilities have been recognized as serving an educational purpose. *See, e.g.*, *Shannon & Luchs Const. Co.*, 17 F.2d at 220-21 (construction of an athletic field for a high school was for an educational purpose and permitted by zoning regulations); *Burgoon v. Zoning Hearing Bd. of Charlestown Twp., Chester Cnty.*, 277 A.2d 837, 841, 843 (Pa. Commw. Ct. 1971) (equestrian center providing instruction in horsemanship was permitted as an "educational use" because "educational use" in zoning ordinance "encompasses institutions which conduct moral, intellectual [o]r physical training"); *Yancey v. Heafner*, 150 S.E.2d 440, 441 (N.C. 1966) (permitting the construction of a 4,000-seat, concrete, lighted stadium as an ancillary athletic playing field of a high school in a residential zone, recognizing that "[t]he use of an athletic playing field in our modern day educational system has become an integral part of the school curriculum"); *Nat'l Collegiate Realty Corp. v. Bd. of Cnty. Comm'rs of Johnson Cnty.*, 690 P.2d 1366, 1372 (Kan. 1984) ("There is no serious contention that, generally speaking, physical education and sports programs in universities are not within proper 'educational purposes' . . . .").

The BZA observed that it has a "long-standing practice . . . to consider . . . [athletic] facilities as an intrinsic aspect of a private school use, not a separate accessory or subordinate use," and we see no reason to disturb this practice given the broad language in Section 200.2(k)(1). *Cf. Georgetown Residents All. v. D.C.*

*Bd. of Zoning Adjustment*, 816 A.2d 41, 47 (D.C. 2003) ("We have generally afforded the BZA fairly wide latitude in construing the term 'accessory use' so long as its interpretation is rational and not inconsistent with the zoning regulations."). Accordingly, we reject Friends's contention that an educational use is confined to academic learning and hold that under Section 200.2(k)(1), athletic facilities can serve an educational purpose.

Next, we turn to whether athletics are educational at Maret. The record indicates that the proposed athletic facilities will support Maret's existing athletics program, which is an integral component of Maret's educational mission. Indeed, athletics are one of Maret's "four essential pillars" (along with academics, arts, and wellness) "that define Maret's educational program." Maret's coaches "teach important skills" related to "core values" of "fair play, self-discipline[,] and cooperation," and participation in varsity athletics satisfies part of the physical education requirement, which is necessary for graduation. Accordingly, we hold that the BZA did not err in determining that the athletic facilities at Maret are a principal, educational use.[6]

---

[6] Friends claims that the BZA's decision is inconsistent with this court's decision in *Nat'l Cathedral Neighborhood Ass'n v. D.C. Bd. of Zoning Adjustment*, 753 A.2d 984 (D.C. 2000). In that case, the BZA granted the National Cathedral

Friends separately argues that even if athletic facilities *can* constitute a principal educational use, that will not be true with Maret and the proposed facilities given Maret's plans to lease the facilities to third parties. In Friends's view, this makes the facilities more akin to a private recreation center or commercial gymnasium. We are unpersuaded by Friends's position in light of the BZA's findings and the record.

Maret identified the specific times its students will use the athletic facilities throughout the year and "devised a detailed schedule" indicating when the facilities will be available for use by other schools, youth sports organizations, summer camps, or unaffiliated persons in the community. The BZA found that the use of the athletic facilities by third parties would be "managed in a way similar to [Maret]'s current operation at its main campus" and will therefore be "limited." Additionally, the record shows that Maret entered into a memorandum of understanding with the ANC mandating that (1) Maret's "athletic fields are to be used primarily by Maret

_____

School's special exception request to construct an athletic facility, finding that the facility constituted either a principal or accessory use of the school. *Id.* at 986. This court affirmed the BZA's ruling on the basis that the proposed facility was an accessory use and declined to consider whether it was a principal use. *Id.* We are unconvinced by Friends's argument that athletic facilities cannot constitute a principal use under *Nat'l Cathedral Neighborhood Ass'n*, given that we did not opine on the matter in that case.

to support its athletic programs"; and (2) "any leased use of the fields to youth sports groups or for non-Maret summer camps shall not exceed the time of Maret's use in any calendar year." We conclude that there is substantial evidence to support the BZA's conclusion that third-party use of the athletic facilities will not alter the nature of Maret's proposed use.[7]

Furthermore, that Maret intends to charge a fee to third-party users "to defray a portion of maintenance costs" does not automatically convert Maret's educational use into a commercial use. *See Ass'n for Pres. of 1700 Block of N St., N.W. & Vicinity v. D.C. Bd. of Zoning Adjustment*, 384 A.2d 668, 673-74 (D.C. 1978)

---

[7] We are not persuaded by Friends's concern that the BZA's order is flawed because it does not require Maret to adhere to its third-party use schedule. In assessing whether Maret was entitled to a special exception, the BZA was required to predict Maret's "probable future behavior," *Bakers Loc. Union No. 118 v. D.C. Bd. of Zoning Adjustment*, 437 A.2d 176, 180 (D.C. 1981), and, as explained above, the record supports the BZA's conclusion on this issue.

One could argue that use of a field five percent of the time by a school for an educational use and ninety-five percent of the time by a third party for a commercial, non-educational purpose, such as use by a restaurant or retailer through a sublease, would constitute circumvention of the applicable zoning regulations. *See* 11-U D.C.M.R. § 101.1 ("When special exception relief is permitted for a use not meeting the matter-of-right requirements for its use group, that special exception relief shall not be used to relieve a condition that prohibits a use or activity or places a limitation on a use or to permit a prohibited use or a use that is specifically identified as not permitted."). Based on the record, we do not face such a scenario here and express no opinion on it.

(YMCA's proposal to make some of its facilities available to the general public and allow the incidental sale of goods and services to nonmembers did not change its principal use as a "private club" given the low percentage of use and income derived from nonmembers); *see also* 11-B D.C.M.R. § 201 (rules for determining use categories). The BZA noted that it "has a long-standing practice of authorizing private schools to allow use of their facilities by unaffiliated users, which may entail the charging of a fee, as part of the approval of a special exception for private school use." We are unpersuaded that this practice is inconsistent with the zoning regulations.[8]

Accordingly, we hold that Maret's proposed athletic facilities constitute a principal, private school use under 11-B D.C.M.R. § 200.2(k)(1).

### 2. Athletic Facilities Are Not Classified as an Accessory Use Under Section 200.2(k)(2)

11-B D.C.M.R. § 200.2(k)(2) provides that private school uses described in Section 200.2(k)(1) "may include, but are not limited to: accessory play and athletic

---

[8] We note the requirement for private educational use that the use must "provide[ ] District or state mandated basic education or educational uses." 11-B D.C.M.R. § 200.2(k)(1). Friends suggested in its reply brief that Maret's physical education requirements exceed District mandated physical education requirements. We generally do not consider arguments raised for the first time in a reply brief, *Vornado 3040 M St., LLC*, 2024 WL 3529437, at *10 n.13, and we decline to do so here.

areas, dormitories, cafeterias, recreational, or sports facilities." Friends argues that under Section 200.2(k)(2), athletic facilities are classified as an accessory use, because the word "accessory" modifies every type of use in the list, including "sports facilities." Friends claims, therefore, that Maret's proposed athletic facilities—which are located miles away from Maret's main campus—violate 11-B D.C.M.R. § 100.2's requirement that an accessory use must be on the "same lot with the principal use." Offering a different reading, Maret contends that "accessory" modifies only "play and athletic areas" and does not modify "dormitories, cafeterias, recreational, or sports facilities." The BZA agreed with Maret. We affirm and hold that athletic or sports facilities are not necessarily accessory uses under the zoning regulations.

Friends's interpretation of the regulation is unpersuasive in light of the similar terminology used in the immediately preceding subsection concerning "College/University" education uses. For comparison, the two provisions are as follows:

> (j) Education, College/University:
>
> . . .
>
> (2) Above uses may include, but are not limited to: *accessory* athletic and recreational areas, dormitories, cafeterias, ancillary commercial uses, multiple academic and administrative buildings, or sports facilities;
>
> . . .

(k) Education, Private:

 . . .

(2) Above uses may include, but are not limited to: *accessory* play and athletic areas, dormitories, cafeterias, recreational, or sports facilities;

11-B D.C.M.R. § 200.2(j)(2), (k)(2) (emphases added).

Under a natural reading of Section 200.2(j)(2), the term "accessory" precedes and modifies only "athletic and recreational areas." The subsequent uses listed—dormitories, cafeterias, ancillary commercial uses, multiple academic and administrative buildings, or sports facilities—appear to be independent from the modifier. Otherwise, "accessory" would modify "ancillary commercial uses," which would appear to be redundant.

We apply the same approach in our reading of Section 200.2(k)(2) and hold that "accessory" modifies only "play and athletic areas" and not "sports facilities." *See Booz Allen Hamilton Inc. v. Off. of Tax & Revenue*, 308 A.3d 1205, 1209 (D.C. 2024) ("[W]e do not read statutory words in isolation; the language of surrounding and related paragraphs may be instrumental to understanding them.").

Moreover, even assuming "accessory" does modify every term in the list, the regulations do not necessarily classify each listed use as accessory. Section 200.2(k)(2) makes clear that the "[a]bove uses *may include, but are not limited to*" the following example uses. Thus, under the regulations, athletic

facilities *may* be an accessory use, but they are not, as Friends contends, absolutely defined as one.[9]

In sum, we do not perceive anything unreasonable about the BZA's ruling that athletic facilities may constitute a principal private school use when the applicant has shown that those facilities "are operated as an integral component" of the school's educational use under 11-B D.C.M.R. § 200.2(k). We therefore hold that Maret's athletic facilities are a principal private school use.

## B.  Objectionable Conditions

The BZA may grant a request for a special exception if the exception "will (1) be in harmony with the general purpose and intent of the zoning regulations and maps, (2) not tend to have an adverse effect on the use of neighboring property in accordance with the zoning regulations and maps, and (3) meet all of the conditions

---

[9] Relatedly, Friends asserts that the BZA failed to explain why Maret's proposed construction constituted "athletic facilities" as opposed to "athletic areas," which would be an "accessory" use under Section 200.2(k)(2). We discern no error. There is substantial evidence supporting the BZA's finding that Maret's proposed multipurpose field, baseball diamond, and field house constitute "facilities," as they are designed specifically to facilitate organized sports practices and games. *See Facility*, Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/facility (defining "facility" as "something that promotes the ease of any action, operation, transaction, or course of conduct" or "something . . . that is built, constructed, installed, or established to perform some particular function or to serve or facilitate some particular end").

specified in the zoning regulations." *Citizens for Responsible Options v. D.C. Bd. of Zoning Adjustment*, 211 A.3d 169, 184 (D.C. 2019); 11-X D.C.M.R. § 901.2. The applicant has the burden of proving entitlement to a special exception. 11-X D.C.M.R. § 901.3. The BZA "must grant the request if it finds that all of the express conditions for the exception set forth in the zoning regulations have been met." *Citizens for Responsible Options*, 211 A.3d at 184.

A private school seeking a special exception for use in a residential zone has a number of additional conditions it is required to meet, including that the school "[s]hall be located so that it is not likely to become objectionable to adjoining and nearby property because of noise, traffic, number of students, or otherwise objectionable conditions." 11-U D.C.M.R. § 203.1(m); 11-X D.C.M.R. § 104.2.

Friends claims that the BZA's approval of Maret's application contravenes the applicable zoning regulations and was arbitrary and capricious. It asserts that the BZA failed to consider whether: (1) Maret's use of artificial turf will harm the community; (2) the construction of retaining walls, netting, and fencing will obstruct views for neighboring property owners; and (3) additional community-friendly conditions limiting third-party use are necessary. We disagree and affirm.

## 1.     Artificial Turf

According to Friends, the BZA erroneously concluded that Maret's use of artificial turf will not create objectionable conditions, because it ignored evidence that the artificial turf contains per- and poly-fluoroalkyl substances ("PFAS"). We are unpersuaded.

At the public hearing, Friends offered testimony from two witnesses that cautioned against the use of artificial turf on the field because such turf contains PFAS. Their testimonies indicated that exposure to PFAS causes adverse health risks and can cause cancer and affect development in children. The witnesses also acknowledged, however, that "the science [on PFAS] is extremely incomplete," the "EPA does not yet regulate PFAS," and the "[i]ndustry" claims to use "the safe kind of PFAS." Maret did not present any evidence concerning PFAS. At the hearing's conclusion, the chairman of the Zoning Commission acknowledged that the concern about PFAS was "very important to the residents of this country" but opined that other agencies or regulatory bodies will handle PFAS regulation and that it lacked sufficient expertise on the subject.

In its order, the BZA did not explicitly address the consequences of PFAS exposure when discussing Maret's decision to use artificial turf over natural grass.

Although we must remand the case if the BZA fails to make a finding on a "material contested issue of fact," *Levy*, 570 A.2d at 746, we do not think the PFAS concern was material. Apart from the brief testimony Friends presented at the public hearing, it appears that PFAS were not a significant issue of contention among the interested parties. More significantly, despite some evidence indicating adverse health consequences associated with PFAS exposure, the testimony also showed that PFAS were not regulated at the time of the BZA's decision and that the research concerning PFAS exposure "is extremely incomplete."

"[A]n issue is not necessarily 'material' simply because evidence was presented on the point at the hearing." *Lee v. D.C. Zoning Comm'n*, 411 A.2d 635, 638 (D.C. 1980) (citing *Wheeler v. Bd. of Zoning Adjustment*, 395 A.2d 85, 88-89 (D.C. 1978)). Material issues "concern matters which the agency must consider as part of its decision-making process," *id.*, such as those that "are within the conditions to be considered under the Zoning Regulations before an exception can be granted," *Dietrich v. D.C. Bd. of Zoning Adjustment*, 293 A.2d 470, 473 (D.C. 1972). We see no basis to conclude that the BZA had to consider the PFAS issue before granting Maret's exceptions. Thus, in light of the record before us, we do not believe that this issue was material and merited explicit discussion. *See Lee*, 411 A.2d at 638-40 (reviewing the record and determining which issues were material to Zoning Commission's decision granting application to amend zoning map).

## 2.     Visual Impact

Before the BZA, Friends argued that the retaining walls, netting, and fencing would create a "visual intrusion" for neighboring properties. Friends maintains on appeal that the BZA disregarded evidence that these structures "will loom over the homes" and "completely block" the views of the field for adjacent property owners. We affirm the BZA's conclusion that the appearance of the athletic facilities will not create objectionable conditions.

The BZA made several findings about the specific structures at issue. Because part of the property was "significantly slope[d]," Maret sought to regrade the lower area and construct a series of retaining walls "at three levels to accommodate a change in grade of 12 feet." The retaining walls will be "topped by chain link fences in several locations near the outer edges of the subject property" and will comply with the "limits on the height[s] of retaining walls." *See* 11-C D.C.M.R. § 1401 (retaining walls requirements). The BZA also found that Maret will install netting around the facilities ranging from twenty to thirty feet in height and an ornamental black, aluminum picket fence up to six feet in height around the perimeter of the property except for a community open space in the northwest corner.

The BZA concluded that the appearance of Maret's athletic facilities would not cause objectionable conditions. It explained that Maret's installation and

maintenance of "a variety of plantings around the perimeter" would "help screen views of the athletic facilities," and that Maret "designed other aspects of the athletic facilities, including the netting[,] . . . in a manner that will minimize their visual impacts."

Although the BZA did not explicitly discuss whether the retaining walls, fencing, and netting would adversely affect the views of the field for neighboring residents, we are not convinced that the failure to do so was erroneous. The potential "visual intrusion" was not an issue that the BZA was required to address with particularity,[10] the issue was addressed in a larger context, and there is substantial evidence to support the BZA's conclusion that the appearance of the retaining walls, netting, and fencing would not create objectionable conditions.

---

[10] The BZA must give "great weight" to and address the concerns of the ANC and Office of Planning. D.C. Code §§ 1-309.10(d)(3)(A), 6-623.04. Neither the ANC nor the Office of Planning shared Friends's concern about the potential visual impact of the athletic facilities. Thus, this was not an issue that the BZA needed to specifically acknowledge or "provide[ ] a reasonably precise explanation for any disagreement[ ]" with. *See Spring Valley-Wesley Heights Citizens Ass'n v. D.C. Zoning Comm'n*, 88 A.3d 697, 705 (D.C. 2013), as amended (Mar. 27, 2014); *see also Lovendusky v. D.C. Bd. of Zoning Adjustment*, 852 A.2d 927, 932-33 (D.C. 2004) (under zoning regulations, the BZA was not required to "consider the views of adjoining and nearby neighbors as 'material'" or "address those views with particularity"; the regulation "simply requires that a private school in a . . . residential district be located so that it is not 'objectionable to adjoining and nearby property'" (quoting what is now 11-U D.C.M.R. § 203.1(m))).

Before the BZA, Maret submitted an architectural plan and several exhibits, which illustrated how the athletic facilities (including the retaining walls, fences, and netting) will look from different perspectives. These perspective renderings captured the views from the four streets surrounding the property—Nebraska Avenue, 28th Street, Rittenhouse Street, and Utah Avenue—and from the intersection between Rittenhouse Street and Utah Alley. While the trees, retaining wall, semi-transparent netting, light-colored poles, and picket-fence will change the views of the field for the neighboring property owners, we are unconvinced that Maret's improvements "will loom over the homes" or "completely block" the views of the field.

Although Friends submitted its own illustrations and testified about the potential visual impact, "[a]s the trier of fact, the [BZA] may credit the evidence upon which it relies to the detriment of conflicting evidence, and need not explain why it favored the evidence on one side over that on the other." *Citizens for Responsible Options*, 211 A.3d at 179 (internal quotation omitted). Here, the BZA credited Maret's visual projections—which Maret must comply with as a condition of its project's approval—and reasonably concluded that the appearance of the facilities would not create objectionable conditions. *See Spring Valley-Wesley Heights Citizens Ass'n*, 88 A.3d at 723 (affirming the Zoning Commission's "finding that the visual impact of the building would not be objectionable," in part because

"the Commission was entitled to credit [the applicant's] tests and simulations and other evidence" over contrary evidence and was not required to agree with the ANC's concerns and recommendations).

Furthermore, the Office of Planning's report specifically addressed the potential visual impact of the improvements and concluded that they will not adversely affect the use of neighboring property. The report noted that (1) the construction of new retaining walls and regrading of the property will not be "unduly disruptive for the neighborhood"; (2) the proposed netting will be "designed to reduce [its] visibility [more] than originally proposed through lowering the height and lightening the color"; and (3) "[s]ince no new buildings are proposed, there should be no undue effect on the light and air to adjacent properties, or residential properties across the street."

Accordingly, we hold that there is substantial evidence to support the BZA's conclusion that the appearance of Maret's proposed athletic facilities will not cause objectionable visual impact conditions.[11] *See Draude v. D.C. Bd. of Zoning*

---

[11] Maret correctly maintains that it may construct retaining walls as a matter of right. *See* 11-C D.C.M.R. § 1402.1 (requiring a special exception only if retaining walls fail to meet the requirements of Section 1401). Maret contends, therefore, that its retaining walls cannot constitute an objectionable condition justifying the denial of its application. The BZA did not address this issue, and we decline to opine on it

*Adjustment*, 582 A.2d 949, 960-62 (D.C. 1990) (substantial evidence existed to support the BZA's conclusion that nonconforming roof structure would not adversely affect light and air of adjacent condominium or lead to objectionable conditions, given architect's testimony and illustrations explaining that the penetration of direct sunlight and use of light-colored building materials, which would maximize reflected light, will not adversely impact condominium).

### 3. Additional Conditions

Friends argues that the BZA erred because it failed to explain why it did not impose additional "community-friendly" conditions seen in other Board decisions granting private school special exceptions. Friends offers no authority for the

---

because, in any event, the retaining walls are only one of the several elements that Friends claims will create an adverse visual impact.

Additionally, we are unpersuaded by Friends's reliance on *Economides v. D.C. Bd. of Zoning Adjustment*, 954 A.2d 427 (D.C. 2008), in support of its argument that the visual impact of the athletic facilities is likely to become objectionable. In *Economides*, this court held that a neighbor had standing to appeal the issuance of a permit allowing property owners to build a retaining wall, because the elevated platform structure negatively affected the air and light available to him and he experienced "an appreciable change in the view." *Id.* at 434. Contrary to Friends's contention, we see no error in the BZA's decision not to explicitly address *Economides*. This court's discussion concerned whether the neighbor had a cognizable injury for standing purposes. *Id.* Moreover, the central question here is whether there was substantial evidence for the BZA to conclude that the visual impact will not cause objectionable conditions and not whether any "appreciable change in view" will occur.

proposition that the BZA must impose consistent conditions in different cases, and we decline to remand on this basis.

The BZA possesses the authority to impose reasonable conditions when granting special exceptions. *President & Dirs. of Georgetown Coll. v. D.C. Bd. of Zoning Adjustment*, 837 A.2d 58, 69 (D.C. 2003). Here, the BZA considered numerous conditions and recommendations proposed by the parties in the proceeding (including DDOT, the Office of Planning, the Office of the Attorney General, and the ANC) and adequately discussed why objectionable conditions are unlikely to occur, subject to the conditions imposed in its order. Thus, we discern no error in the BZA's failure to discuss why more extensive conditions limiting the field's use—some of which are found in other private school special exception applications—were not imposed. *Cf. Roth v. D.C. Bd. of Zoning Adjustment*, 279 A.3d 840, 848 (D.C. 2022) (concluding that the BZA "reasonably declined to give weight to" prior decisions declining to grant variances that would have permitted delicatessens to operate on the same block, where those decisions were decades old, applied a different legal standard, and rested on different factual records); *Glenbrook Rd. Ass'n v. D.C. Bd. of Zoning Adjustment*, 605 A.2d 22, 32 (D.C. 1992) ("The applicant is not charged with considering every option that any party in opposition might conceptualize." (alteration and internal quotation omitted)).

## IV. Conclusion

For all of the foregoing reasons, we affirm the Board of Zoning Adjustment's order.

*So ordered.*